[No. 19205.   Department Two.   April 23, 1925.]

# THE STATE OF WASHINGTON, *on the Relation of the State Capitol Committee, Plaintiff,* v. C. W. CLAUSEN, *as State Auditor, Respondent.*[1]

STATES (34)—BONDS—PUBLIC DEBT—LIMITATION—SUBMISSION TO VOTE—CONSTITUTIONAL PROVISIONS. Laws of 1925, p. 61, § 1 *et seq.*, providing for the bonding of the capitol building lands, the principal and interest of the bonds to be payable only from revenues thereafter received from the lease or sale of granted lands, which the state holds in trust in its representative capacity, does not create a debt without a vote of the people, in violation of Const., Art. 8, § 3.

SAME (34). The fact that moneys raised by taxation for capitol building purposes go into the same fund as the revenues from bonding the state granted lands, does not authorize the payment of any part of the bonds from moneys raised by taxation.

SAME (25, 26)—APPROPRIATIONS—MODE AND SUFFICIENCY. Const., Art. 8, § 4, providing that moneys shall not be paid out of the treasury except in pursuance of an appropriation by law, nor unless payment is made within two years from the first day of May next following, is not violated by the Act of 1925, p. 63, § 5, appropriating four million dollars for capitol grounds and construction, without the constitutional limitation to two years; since that will be read into the act.

SAME (34)—BONDS—FORM AND REQUISITES. Under such act, the bonds being payable only out of revenues received from the lease or sale of granted lands, which are paid into the capitol building fund, it is not the proper form to issue bonds in which the state acknowledges its indebtedness and promises to pay the same out of the capitol building and construction fund, derived in part from general taxation.

Application filed in the supreme court March 10, 1925, for a writ of mandamus to compel the state auditor to execute a bond to be issued by the state capitol committee. Granted.

*The Attorney General* and *R. G. Sharpe, Assistant,* for plaintiff.

*Oakley & Thompson,* for respondent.

[1]Reported in 235 Pac. 364.

BRIDGES, J.—As everybody knows, the United States government, by § 12 of the Enabling Act, gave to the state fifty sections of land "for the purpose of erecting public buildings at the capital of said state for legislative, executive and judicial purposes," and that by § 17 of the same act it gave to the state "for public buildings at the state capital, in addition to the grant hereinbefore made for that purpose, one hundred thousand acres. . . ." By appropriate legislative action, the state accepted the gift and bound itself to carry into effect its purposes. Section 1, art. 16, of the state constitution touches the question, for it provides that "all the public lands granted to the state are held in trust for all the people, and none of such lands, nor any estate or interest therein, shall ever be disposed of unless the full market value of the estate or interests disposed of, to be ascertained in such manner as may be provided by law, be paid or safely secured to the state; . . ."

From time to time, small portions of the grants mentioned have been sold, but for the most part they remain intact in the state. Inasmuch as these lands have been greatly increasing in value, it seems to have been the policy of the state to withhold them from sale for the present, and with this thought in mind, the legislature in 1917 provided for a one-half mill property tax to raise money for capitol building purposes. Section 7916 et seq., Rem. Comp. Stat. [P. C. § 6294]. That act also provided that the moneys raised in the manner aforesaid "shall be charged against the land grant for capitol purposes to the state from the general government, and as moneys are derived from the sale, lease, or other disposition of said land grant, the advancements hereby provided for shall be repaid to the general fund of the state; provided, that no moneys received from such sale, lease, or disposition shall be

returned to the state treasury until all warrants, bonds or other outstanding obligations against the capitol building fund shall have been paid." Section 7917, Rem. Comp. Stat. [P. C. § 6296]. As the law now stands, all moneys for capitol building purposes, whether raised by taxation or arising from the sale or lease of capitol land grants, are to be paid into the state treasury and credited to a fund known as the capitol building construction fund. A somewhat recent appraisal by the state of the undisposed of capitol lands shows them to have a present value of considerably more than eleven million dollars.

At the 1925 session of the legislature, chap. 27 with reference to capitol building bonds was enacted. Section 1 provides that:

"The State Capitol Committee may, in its discretion, issue coupon or registered bonds of the State of Washington in an amount not exceeding four million dollars ($4,000,000.00) . . . both principal and interest to be payable only from the capitol building construction fund from revenues hereafter received from leases and contracts of sale heretofore made, and from leases and sales hereafter to be made, of lands, timber and other products from the surface, or beneath the surface, of the lands granted to the State of Washington by the United States, pursuant to an act of Congress approved February 22, 1889, for capitol building purposes." Laws of 1925, p. 61, § 1.

The act fixes the interest which the bonds shall draw and the price at which they shall be sold, and provides that they shall not run longer than twenty years from their date, and that interest shall be payable semi-annually, and that all funds from the sale of the bonds shall be paid into the capitol building construction fund. It is further provided that " . . . the state treasurer may, and he is hereby authorized to invest surplus cash in the accident fund in said bonds at par,

at such rate of interest, not exceeding five per cent, as may be agreed upon.'' Laws of 1925, p. 61, § 1. The bonds are to be signed by the governor and state auditor and shall be under the seal of the state. Section 5 of the act is to the effect that:

''There is hereby appropriated out of the capitol building construction fund the sum of four million dollars ($4,000,000.00) to be expended by the State Capitol Committee in the completion of the construction of the administration and legislative building, now under construction in the State Capitol group, according to the plans adopted by said Capitol Committee, and the purchase of fixtures, mechanical and electrical devices for said administrative and legislative building, and the acquisition by purchase and/or condemnation of property heretofore authorized by law to be acquired, and for the erection of the memorial heretofore authorized by law, and for improving and laying out the Capitol Grounds.'' Laws of 1925, p. 63, § 5.

Section 6 reads thus:

''This Act is concurrent with other legislation with reference to raising revenue to construct Capitol buildings, and is not to be construed as repealing or limiting any existing provision of law with reference thereto.'' Laws of 1925, p. 63, § 6.

This leaves in force the act providing for the one-half mill levy.

The state capitol committee, on March 7, 1925, at a regular meeting, adopted a resolution to issue bonds under the act in the amount of $500,000, bearing interest at 4½ per cent per annum. This resolution embodied a form of the bond proposed. At this meeting the state treasurer offered to purchase the entire issue of bonds for the accident fund. The committee then accepted the treasurer's bid. One of the bonds was executed by the governor and a request was made of the state auditor to execute it also and attach the seal of the state. This he refused to do, claiming that the

legislative act of 1925 was unconstitutional and void. This proceeding was instituted for the purpose of compelling the state auditor to execute the bond and attach the seal thereto.

Respondent contends that the 1925 legislative act is void for the following reasons:

(1) Because it creates a debt without a vote of the people, contrary to the provisions of § 3, art. 8, of the state constitution;

(2) Because there is in force a legislative act providing for a one-half mill property tax to raise funds for capitol building purposes, and that because those funds and any others raised by the lease or sale of the granted lands are required to be kept in the capitol building construction fund, the payment of interest on the bonds in question would be, at least in part, paid from moneys raised by taxation, which would be in effect the creation of a debt;

(3) Because it violates § 4, of art. 8, of the state constitution with reference to appropriations by the legislature of moneys out of the state treasury;

(4) Because the proposed form of the bond is unauthorized by any provision of law.

In the early portion of his brief the respondent also attacks the law on the ground that it has the effect of mortgaging the capitol building lands in violation of the Enabling Act. Later, however, in his brief and in the oral argument, he withdraws this contention, conceding, in substance, that the law does not violate any provision of the Enabling Act. Under these circumstances, it will be unnecessary for us to discuss that question or to say anything further concerning it than that an examination of the Enabling Act convinces us that the 1925 law in no wise entrenches upon or violates it.

(1)  Will these bonds if issued create a debt in violation of the provisions of article 3, § 8, of the state constitution?

Our answer is, No.  Section 1, of article 8, of the constitution, provides that the state may, to meet casual deficiencies or failure of revenues, or for expenses not provided for, contract debts which shall not at any time exceed $400,000.  Section 2 of the same article is unimportant in this connection.  Section 3 provides:

"Except the debt specified in sections one and two of this article, no debts shall hereafter be contracted by or on behalf of this state, unless such debt shall be authorized by law for some single work or object to be distinctly specified therein, which law shall provide ways and means, exclusive of loans, for the payment of the interest on such debt as it falls due, and also to pay and discharge the principal of such debt within twenty years from the time of the contracting thereof. No such law shall take effect, until it shall, at a general election, have been submitted to the people  . . ." and be approved by them.

It has been held that, under grants such as those here, the state becomes the absolute owner of the title to the lands and that the United States has parted with all control over them.  *State of Alabama v. Schmidt,* 232 U. S. 168; *State of Louisiana v. Joyce Co.,* 261 Fed. 128.  Although the state owns the lands, it holds them in trust for a particular purpose, or, as was said in *State of Alabama v. Schmidt, supra:* "the gift to the State is absolute, although, no doubt, as was said in *Cooper v. Roberts,* 18 Howe 173, 'there is a sacred obligation imposed on its public faith'."  The state owns these lands in its fiduciary or representative and not in its proprietary capacity.

The legislative act under discussion expressly provides that the principal and interest of the bonds authorized shall be payable only from revenues hereafter

received from the lease and sale of the granted lands. In no possible way is the credit of the state involved. Not one dollar of its general property can be used to discharge those bonds or the interest on them. Not one dollar of taxes can be put to that purpose. The state is only carrying into effect the trust imposed on it, which is to use these granted lands or moneys derived from them to construct capitol buildings. Its only obligation under this act is to see that all the revenues hereafter received from the lease or sale of the granted lands shall be applied towards the payment of these bonds and their interest. On no principle of law can it be said that, under these circumstances, any debt has been contracted "by or on behalf of this state."

Twice before has the legislature undertaken to raise money on these granted lands and each time this court has held the acts unconstitutional; but the present law does not contain any of the vicious elements that were found in the former legislation. The case of *State Capitol Commission v. State Board of Finance*, 74 Wash. 15, 132 Pac. 861, disposes of ch. 59, Laws of 1911, p. 319 [Rem. Comp. Stat., § 7906], as amended by ch. 50 of the Laws of 1913, p. 139 [Rem. Comp. Stat., § 9907]. Those laws provided that the state should guarantee the principal and interest of certain proposed capitol building bonds, and we held that such guarantee pledged the general credit of the state and constituted the contracting of an indebtedness in violation of the constitutional provision.

The case of *State ex rel. State Capitol Commission v. Lister*, 91 Wash. 9, 156 Pac. 858, held that a legislative act of 1915 for the bonding of the capitol building lands, the principal to be paid from the sale of granted lands but the interest to be paid by an annual tax levy, created a debt in violation of the constitution. It will be observed that, in the first case, the state

pledged itself to pay both the principal and interest of the bonds, and in the second case obligated itself to pay the interest.

If it were thought necessary to support our conclusion by authority, we might cite *Allen v. Grimes,* 9 Wash. 424, 37 Pac. 662; *State ex rel. Attorney General v. McGraw,* 13 Wash. 311, 43 Pac. 176. In the first case, it was held that warrants drawn on the capitol building fund do not create any debt in the constitutional sense, although there was no money in the fund to meet the warrants. We said:

"There is under the law absolutely no obligation resting upon the state to pay any sum whatever, and those who may receive the auditor's warrants will be limited in their rights to the requirement of the proper officers to perform their duties as prescribed by the statute. . . . Under this condition of affairs, we see no valid objection to the auditor's issuing to the relator the warrant which he prays for, provided that it expresses upon its face the terms and conditions under which it is issued, viz, that it is drawn solely upon the state capitol building fund and payable only as that fund may be accumulated from the sale of lands."

In the case of *State ex rel. Attorney General v. McGraw, supra,* we held that, if the capitol commission issues warrants on the capitol building fund and exchanged them for cash which is deposited with the state treasurer and which is to be drawn out by certificates issued by the capitol commission, this is not the creating of a debt on behalf of the state. The doctrine of the case of *Allen v. Grimes, supra,* was approved in *State ex rel. Bickford v. Cook,* 17 Mont. 529, 43 Pac. 928. But it seems so clear to us that the law under discussion does not create any debt in violation of the constitution that we deem it unnecessary to cite further authorities.

While we have carefully read all, we will not review any of the cases cited by respondent except *Rodman v. Munson,* 13 Barb. (N. Y.) 63, and *Newell v. People ex rel. Phelps,* 3 Seld. (N. Y.) 9, which he claims to be nearest in point. These cases involved the validity of a New York statute which attempted to authorize certain state officials to issue certificates of indebtedness for money borrowed, which certificates were to be payable only from the revenues received from a state owned system of canals. Both the law and the certificates recited that the obligation was not that of the state and that the holders were entitled to look only to the canal revenues for payment. Whether those cases may be considered out of harmony with *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365, and other similar cases from this court, we will not discuss. In any event, they are not out of harmony with our holding in this case. There the revenues pledged came from the operation of canals owned by the state in its proprietary capacity. Its revenues when collected belonged to the state and might be applied towards the discharge of any of its general obligations. Any amount of the funds so arising which must go to the discharge of the certificates which were sought to be issued would have been made up by taxation of the property within the state or of its people in some form or other. The situation here is very different. These granted lands do not belong to the state in the ordinary sense and any moneys coming from them can be used only for the purpose of constructing capitol buildings. To us the distinction between those cases and this one is very clear.

(2) It is true, as respondent contends, that the statutes provide that moneys raised by taxation for capitol building purposes and those raised from the lease or

sale of capitol lands go into the same fund in the treasurer's office, but it does not follow from this that these bonds must or may be paid in whole or in part out of money raised by taxation. Any such payment by the treasurer would be wholly unauthorized. The segregation of these moneys in his office would be easy and only a matter of bookkeeping.

(3)   Does the act violate § 4, of article 8, of the constitution, which reads as follows:

"No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law; nor unless such payment be made within two years from the first day of May next after the passage of such appropriation act, and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated and the object to which it is to be applied, and it shall not be sufficient for such law to refer to any other law to fix such sum."

As before quoted, § 5 of the act in question expressly appropriates the whole of the authorized four million dollars. The objection to this manner of appropriation seems to be that it is not limited to two years from the first of May immediately following the passage of the act. Considerable argument is made by both the relator and the respondent concerning the necessity of any legislative appropriation, the former contending that this being a trust fund which cannot be used for any purpose other than for the construction of capitol buildings, the constitutional provision is inapplicable and no appropriation by the legislature is necessary. On the other hand, respondent contends that this money cannot be lawfully withdrawn from the treasury without prior appropriation. We will not here enter into a discussion of this question, because the 1925 act does, as a matter of fact, comply with the

constitutional provision with reference to appropriations. It is true that it undertakes to appropriate the entire proceeds of the bonds and does not expressly limit the appropriation to such amount of such funds as may be expended during the biennium. But that will not make the appropriation ineffectual. The biennium provision of the constitution will be read into the act. If the legislature acted by virtue of this constitutional provision, its action must be governed by its limitations. If an appropriation by the legislature be necessary (which we do not decide), and if the legislature may not at once appropriate the whole sum whether to be expended within the biennium or not (which we do not decide), the appropriation made by the 1925 act is amply sufficient for any sums that may be expended during the biennium, and the legislature may, if it see fit, at its next session re-appropriate any sum arising from the sale of these bonds which may not have been expended within the biennium.

(4)   The respondent makes a very just criticism of the form of the bond which the capitol commission proposes to issue. It recites that "the State of Washington for value received hereby *acknowledges its indebtedness* and for value received hereby promises to pay to the registered holder hereof on the 7th day of March, 1945, the principal sum of $5,000, *solely out of its capitol building and construction fund* and to pay interest thereon at the rate of 4½ percent per annum from date of delivery thereof until paid *solely out of said capitol commission fund.*" (Italics ours.) The bond then proceeds to say that the state pledges itself for the payment into the fund mentioned of all revenues hereafter received from leases and sales of capitol granted lands. Upon its face, any funds, whether raised by taxation or otherwise, found in the capitol

building fund, may be used to pay the principal and interest of this bond. This is not authorized by the act under discussion. If the bond is issued as it now reads, it is likely to lead to trouble and litigation. It should be corrected to show that its principal and interest are to be paid solely out of moneys arising from the lease and sale of capitol grant lands. The resolution passed by the state capitol committee (particularly § 1) is subject to the same fault and should be corrected. We are also of the view that the words "for value received hereby acknowledges its indebtedness" contained in the first and second lines of the bond, should be eliminated, so that the first part will read "the state of Washington for value received hereby promises to pay, etc."

We hold that the 1925 legislative act is not violative of any provision of the Enabling Act or any provision of the state constitution, and that the proper state officials are empowered and authorized by law to execute and issue bonds in the form already prepared, provided they be modified as suggested by us. If such bonds, prepared in the manner indicated, are presented to the respondent, it will be his duty to execute the same and attach the seal of the state thereto.

Tolman, C. J., Holcomb, Fullerton, and Mitchell, JJ., concur.