**STATE of Wyoming ex rel. WYOMING FARM LOAN BOARD, Appellant (Plaintiff),**

v.

**Ed HERSCHLER, Governor, State of Wyoming, Appellee (Defendant).**

**No. 5353.**

Supreme Court of Wyoming.

Feb. 3, 1981.

John D. Troughton, Atty. Gen., Mary B. Guthrie, Asst. Atty. Gen., Cheyenne, Arthur K. Underwood, Jr., and John O. Swendseid of Sherman & Howard, Denver, Colo., attorneys in good standing of the Bar of the State of Colorado, signed the briefs and Underwood appeared in oral argument on behalf of appellant.

Byron Hirst and Alan B. Minier of Hirst & Applegate, Cheyenne, signed the brief and appeared in oral argument on behalf of appellee.

William R. Jones of Jones, Jones, Vines & Hunkins, Wheatland, Wyoming, filed a Brief of amicus curiae on behalf of trustees of the University of Wyoming.

Before ROSE, C. J., and McCLINTOCK, RAPER, THOMAS and ROONEY, JJ.

ROONEY, Justice.

Pursuant to the provisions of § 1–13–101, W.S.1977 [1], the District Court, First Judicial District, County of Laramie, on its own motion, reserved the following questions to this court as important and difficult constitutional questions:

"1. Do Chapters 159 and 160, Session Laws of Wyoming, 1979, and Chapter 56, Session Laws of Wyoming, 1980, violate Article XVI, Section 1 of the Wyoming Constitution by providing a means to exceed debt limitations and prohibitions?

"2. Do Chapters 159 and 160, Session Laws of Wyoming, 1979, and Chapter 56, Session Laws of Wyoming, 1980, violate Article XVI, Section 2 of the Wyoming Constitution for any of the following reasons as asserted by the Defendant and denied by the Plaintiff:

"(a) Providing a means to exceed debt limitations and prohibitions?

"(b) Providing a means to create debt in excess of taxes for the current year without a vote of the people?

"(c) Providing a means to pledge state revenues which may be unilaterally reduced or eliminated by the United States Congress, therefore, creating a risk that future taxpayers may have taxes increased because of legislative actions with respect to a default on the bonds?

"(d) Providing a means to pledge revenues which are used to defray government expenses which would ordinarily have to be borne by taxes?

"(e) Pledging revenues which may be construed as being essentially equivalent to taxes and hence are directly subject to constitutional debt limitation and prohibitions?

"(f) Limiting the discretion of future legislatures to spend future revenues?"

We answer the questions in the negative.

The Findings of Fact and Conclusions of Law made by the trial court determined all factual questions and decided the meaning and effect of all involved statutes sufficient

---

1. Section 1–13–101 provides:

"When an important and difficult constitutional question arises in a proceeding pending before the district court on motion of either party or upon his own motion the judge of the district court may cause the question to be reserved and sent to the supreme court for its decision."

for the presentation to us of the reserved constitutional questions. *White v. Board of County Commissioners of County of Albany*, 77 Wyo. 246, 313 P.2d 484 (1957); *State ex rel. Fawcett v. Board of County Commissioners of Albany County*, 73 Wyo. 69, 273 P.2d 188 (1954); *State v. Rosachi*, Wyo., 549 P.2d 318 (1976).

The status of the case, its factual background, the positions of the parties, the pertinent constitutional provisions, and a recital of pertinent portions of the questioned enactments are contained in the trial court's Findings of Fact and Conclusions of Law (with incorporation therein of the Stipulations of the parties). Although lengthy, we set them forth to reflect the basis upon which the reserved questions are presented to us and to reflect the perimeters in which our answers are given:

### "FINDINGS OF FACT

"The Plaintiff [appellant] and the Defendant [appellee] jointly submitted Stipulations in this case in which certain facts and issues were agreed or admitted. Attached to these stipulations were Exhibits A through F consisting of four resolutions of Plaintiff State Farm Loan Board (Exhibits A, B, D and E), a letter from the Defendant, Governor of the State of Wyoming and President of the State Farm Loan Board in which Defendant refused to sign the bonds in this case (Ex. C) and certain data available to the State Farm Loan Board in connection with its determinations on this matter (Ex. F).[2] The Stipulations and the Exhibits are attached to this Order and incorporated herein as stated here by this reference. "The Court adopts as its Findings of Fact paragraphs I A through I QQ of said Stipulations. To the extent that legal

2. The exhibits are bulky and are not set out herein. Reference will be made to their contents as needed.

3. Sections 9–7–903(b) and 9–7–904(b) are codifications of § 1, Ch. 159 and § 1, Ch. 160,

conclusions are included in those paragraphs, the Court adopts them as its Conclusions of Law. In addition the Court finds that Exhibits A through F are what they purport to be and that the determinations and opinions expressed therein are the determinations and opinions of the individuals or entities expressing them.

### "CONCLUSIONS OF LAW

"The Court makes the following conclusions of law:

"1. The ambiguous language of W.S. 1977 Section 9–7–903(b) and Section 9–7–904(b) [3] is directory, leaving it to the discretion of the Farm Loan Board to determine whether and in what amount to issue bonds and to schedule the issuance of the bonds.

"2. It is necessary that the Farm Loan Board, as agreed, adopt, for lawful and constitutional final selection of projects, procedures requiring that, prior to final selection of said projects, the Farm Loan Board shall promulgate rules and regulations specifying the criteria and methods for selection of projects; and that these rules and regulations provide statewide public notice of said criteria and methods, as well as statewide opportunity to submit project proposals for funding; and that these rules and regulations incorporate the use of technical expertise of the Executive Department of the State of Wyoming in review and selection of projects for funding.

"3. The Wyoming statutes and the resolutions of the Farm Loan Board cited in the attached and incorporated Stipulation and Exhibits were duly adopted and are valid, subject to the reserved constitutional questions and the requirements of paragraph 2, *supra*.

Session Laws of Wyoming 1979, and § 1, Ch. 56, Session Laws of Wyoming 1980. Sections 9–7–903(b) and 9–7–904(b) are set out in full in paragraphs N and O of the Stipulations, infra.

"4. Chapters 159 and 160, Wyoming Session Laws, 1979, lawfully and constitutionally authorize the issuance of $160,000,000.00 of bonds, subject to the reserved constitutional questions.

"5. Bond resolutions passed pursuant to Chapters 159 and 160, Wyoming Session Laws, 1979, lawfully and constitutionally authorize the issuance of $160,000,000.00 of bonds, subject to reserved constitutional questions and the requirements of paragraph 2, *supra.*

"6. There is no plain or adequate remedy in the ordinary course of law whereby Defendant can be compelled as Governor of Wyoming and as President of the Farm Loan Board to execute the bonds on behalf of Plaintiff and this declaratory judgment and mandamus proceeding is a proper remedy."

The following are the Stipulations incorporated by the trial court into its Findings of Fact and Conclusions of Law:

"A. Plaintiff, the Wyoming Farm Loan Board, is an agency of the State of Wyoming. It is comprised of the five principal elected officials of the executive branch of the government of the State of Wyoming, including the Governor, the Secretary of State, the State Treasurer, the State Auditor, and the Superintendent of Public Instruction. The same officials also serve as the Capitol Building Commission.

"B. The Defendant is, and was at all times pertinent to this case, the duly elected, qualified and acting Governor of the State of Wyoming, and President of the Wyoming Farm Loan Board.

"C. This is an action for a declaratory judgment pursuant to the Wyoming Uniform Declaratory Judgments Act, W.S. 1977 § 1–37–101, *et. seq.* for the purpose of determining the question of actual controversy between the parties, to wit: the validity and/or invalidity of certain bonds proposed to be issued for the State of Wyoming by the Plaintiff Farm Loan Board. In addition, it is agreed that

Plaintiff asks that an alternative writ of mandamus be issued to Defendant requiring Defendant to sign the bonds; and that the jurisdiction of this Court is founded on Article V, Section 10 and Section 20 of the Wyoming Constitution, and W.S.1977 § 5–3–101(a)(i).

"D. Venue is properly laid in this Court pursuant to W.S.1977 § 1–5–104.

"E. The 1979 Wyoming State Legislature enacted Chapter 159, 1979 Wyoming Session Laws, which purportedly authorizes the issuance of $100 million dollars of certain bonds; the same Legislature enacted Chapter 160, 1979 Wyoming Session Laws, which purportedly authorizes the issuance of $60 million dollars certain bonds. Chapters 159 and 160 amended portions of Article IX, Chapter 7, Title 9 of the Wyoming Statutes of 1977. The purpose of Chapters 159 and 160 was to meet statewide capital construction requirements. These statutes permit the Farm Loan Board to borrow up to $160 million dollars to assist school districts, community colleges, and other political subdivisions of the state by loans and grants.

"F. The Wyoming Farm Loan Board, on 8 November 1979, pursuant to Chapters 159 and 160, Wyoming Session Laws 1979, adopted two resolutions attached to the Complaint (and attached hereto as Exhibits A and B) purportedly authorizing the issuance of 1980 Series A Bonds in the amount of Fifteen Million Dollars ($15,000,000.00) and 1980 Series B Bonds in the amount of Twenty-One Million Dollars ($21,000,000.00). The vote on each resolution was three to two. Voting aye were: Thyra Thompson [sic], Secretary of State; Jim Griffith, State Auditor; and Lynn Simons, Superintendent of Public Instruction, and voting nay were: Ed Herschler, Governor, and Shirley Wittler, State Treasurer.

"G. The signature of the Defendant, both as Governor and as President of the State Farm Loan Board, is required on

the bonds and on Resolutions A and B and he has been directed by the State Farm Loan Board to sign them. It is essential that this Court order Defendant to sign said bonds in order for Plaintiff to deliver valid bonds. Defendant has, by letter dated November 23, 1979 and attached to Plaintiff's Complaint as Exhibit C (and attached hereto as Exhibit C), and by his pleadings in this case, expressed his refusal to sign the bonds and Resolutions A and B.

"H. The bonds to be issued by the Wyoming Farm Loan Board state, on their face, that they will be secured and paid only by a portion of whatever U.S. mineral royalty monies are received in future years from the Federal Government and distributed to the State of Wyoming pursuant to 30 U.S.C. § 191. There are no alternative or contingent funds or monies designated to pay debt service on the bonds if the Federal monies are insufficient, except bond proceeds. The bonds are not secured in any manner by the revenues of the projects to be constructed with the proceeds of the bonds.

"I. The State of Wyoming is now receiving and has during recent times received these monies from the Federal Government.

"J. 30 U.S.C. § 191 directs the use of the federal monies by the state as follows:

"'... to be used by such State in [sic] its subdivisions as the legislature of the State may direct giving priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this chapter, for (i) planning, (ii) construction and maintenance of public facilities and (iii) provision of public services; ...' [4]

"The 'minerals leased' are coal, phosphate, sodium, potassium, oil, oil shale, native asphalt, solid and semi-solid bitumen and bituminous rock (including oil-impregnated rock or sands from which oil is recoverable only by special treatment after the deposit is mined or quarried) and gas.

"K. Section 191 has been amended in the past and may be amended in the future to increase or decrease the yearly amounts of mineral payment to Wyoming and to change the purposes for which the same could be expended. For the purposes of this case it is agreed that the Federal Government is at liberty to increase or decrease the payment to the state of federal monies pursuant to 30 U.S.C. § 191, or to substantially modify the purposes for which those monies can be used. The United States Congress can do so by changing the percent of the

4. The full text of 30 U.S.C. § 191 is as follows:

"All money received from sales, bonuses, royalties, and rentals of the public lands under the provisions of this chapter and the Geothermal Steam Act of 1970, notwithstanding the provisions of section 20 thereof, shall be paid into the Treasury of the United States; 50 per centum thereof shall be paid by the Secretary of the Treasury as soon as practicable after March 31 and September 30 of each year to the State other than Alaska within the boundaries of which the leased lands or deposits are or were located; said moneys paid to any of such States on or after January 1, 1976, to be used by such State and its subdivisions, as the legislature of the State may direct giving priority to those subdivisions of the State socially or economically impacted by development of minerals leased under this chapter, for (i) planning, (ii) construction and maintenance of public facilities, and (iii) provision of public service; and ex-

cepting those from Alaska, 40 per centum thereof shall be paid into, reserved, appropriated, as part of the reclamation fund created by the Act of Congress known as the Reclamation Act, approved June 17, 1902, and of those from Alaska as soon as practicable after March 31 and September 30 of each year, 90 per centum thereof shall be paid to the State of Alaska for disposition by the legislature thereof: *Provided,* That all moneys which may accrue to the United States under the provisions of this chapter and the Geothermal Steam Act of 1970 from the lands within the naval petroleum reserves shall be deposited in the Treasury as 'miscellaneous receipts', as provided by the Act of June 4, 1920 (41 Stat. 813), as amended June 30, 1938 (52 Stat. 1252). All moneys received under the provisions of this chapter and the Geothermal Steam Act of 1970 not otherwise disposed of by this section shall be credited to miscellaneous receipts."

State's share or entirely eliminating the State's share by amending or repealing the Mineral Lands Leasing Act.

"L. The Wyoming Constitution places limits on the powers of the State to incur indebtedness, Article XVI, Section 1 and Section 2:

" 'Section 1. Limitation on Debt.

" 'The State of Wyoming shall not, in any manner, create any indebtedness exceeding one percent on the assessed value of the taxable property in the state, as shown by the last general assessment for taxation, preceding; except to suppress insurrection or to provide for the public defense.

" 'Section 2. Creation of State Debt in Excess of Taxes for Current Year.

" 'No debt in excess of the taxes for the current year, shall in any manner be created in the State of Wyoming, unless the proposition to create such debt shall have been submitted to a vote of the people and by them approved; except to suppress insurrection or to provide for the public defense.'

"If the proposed bonds are 'debt' the same are unconstitutional and unlawful.

"M. Recently, the Wyoming Legislature, unconstitutionally and unlawfully, attempted to embark on a 'bold course of public financing' to spend now excise tax income of the future by use of bonds issued by the Wyoming Community Development Authority. The Wyoming Supreme Court declared these bonds to be 'debt' and invalid in *Witzenburger v. State, ex rel., Wyoming Community Development Authority*, 575 P.2d 1100 (1978).[5] This decision jeopardized an issue of $27,645,000.00 of Wyoming Capitol Facilities Bonds, issued by the Capitol Building Commission. The Legislature authorized and directed the purchase and redemption of the Capitol Facilities Bonds in part from the general fund of the state and in part by the proceeds from the Capitol Facilities Bonds.

"N. Section 9–7–903(b) W.S.1977 as amended by Chapter 56, 1980 Wyoming Session Laws, provides that:

" 'The farm loan board shall borrow money in a principal amount not to exceed one hundred million dollars ($100,000,000.00) by the issuance from time to time of one (1) or more series of revenue bonds. The board may encumber revenues under W.S. 9–7–901(a)(viii). Any bonds issued under this section, together with any interest accruing thereon and any prior redemption premiums due in connection therewith, are payable and collectible solely out of revenues authorized under subsection (a) of this section. The bond holders may not look to any general or other fund for payment of the bonds except the revenues pledged therefor. The bonds shall not constitute an indebtedness or a debt within the meaning of any constitutional or statutory provision or limitation. The bonds shall not be considered or held to be general obligations of the state but shall constitute its special obligations and the board shall not pledge the state's full faith and credit for payment of the bonds.'

"O. Section 9–7–904(b) W.S.1977, as amended by Chapter 56, Wyoming Session Laws 1980, provides that:

" 'The farm loan board shall borrow money in a principal amount not to exceed sixty million dollars ($60,000,000.00) by the issuance from time to time of one (1) or more series of revenue bonds. The board may encumber renvenues [sic] under W.S. 9–7–901(a)(vii) and (b)(i). Any bonds issued under this section, together with any interest accruing thereon and any prior redemption premiums due in connection therewith, are payable and collectible solely out of revenues authorized. The bond holders may not look to any general or other fund for payment of

---

**5.** The second *Witzenburger* case is reported in 577 P.2d 1386 (1978).

the bonds except the revenues pledged therefor. The bonds shall not constitute an indebtedness or a debt within the meaning of any constitutional or statutory provision or limitation. The bonds shall not be considered or held to be general obligations of the state but shall constitute special obligations of the state and the board shall not pledge the state's full faith and credit for payment of the bonds.'

"P. The wise and proper issuance of many millions of dollars worth of bonds involves a great deal of judgment, and must depend on many factors that can best be ascertained at the time that the bonds are issued.

"Q. The Wyoming Legislature pursuant to W.S.1977, § 9–7–901,[6] has distributed the monies available pursuant to 30 U.S.C. § 191 to numerous governmental entities.

"R. The University of Wyoming receives a portion of the federal monies received by the State pursuant to 30 U.S.C. § 191, and distributed pursuant to W.S.1977 § 9–7–901.

"S. The University of Wyoming as a body corporate lawfully and constitutionally has issued bonds lawfully and constitutionally secured by the monies available pursuant to 30 U.S.C. § 191.

"T. The University of Wyoming is the only university in the State of Wyoming, and serves the entire State. The University of Wyoming has experienced increasing demands for services, as a result of statewide growth, and such growth is largely attributable to development of minerals leased pursuant to Chapter 3A of Title 30 of the United States Code.

"U. Any legislative proposals pending at the time of filing of Defendant's Counterclaim have either become law or not at this time. Such legislation as has duly become law is now before the Court so there is nothing premature or inconclusive about this declaratory judgment litigation.

"V. On 10 April 1980, Plaintiff held a special meeting and duly and properly enacted two resolutions (attached to Plaintiff's Supplemental Reply to Counterclaim as Exhibit C, and attached hereto as Exhibits D and E) to bring the 1980 Series A Bond Resolution and the 1980 Series B Bond Resolution into compliance with Chapter 56, 1980 Wyoming Session Laws.

"W. Pursuant to Plaintiff's 10 April 1980 action, Defendant now agrees that deposit of federal monies in special funds and the use of said monies to pay debt service on these bonds will not impair or adversely affect the objectives contemplated and the directions given by the Federal Government in 30 U.S.C. § 191.

"X. Pursuant to Plaintiff's action on 10 April 1980, Defendant now admits that a declaration of rights, status, and legal relations will terminate the uncertainty and controversy arising from the refusal of Defendant to sign the Bonds or the Resolutions.

"Y. Pursuant to Plaintiff's action of 10 April 1980, Defendant now admits that the issues raised in ¶¶ 23 to 25 of his Counterclaim [7] are no longer properly before this Court.

"Z. Pursuant to Plaintiff's action of 10 April 1980, Defendant now admits that ¶¶ 32 to 37 of Defendant's Counterclaim [8] are no longer properly before this Court.

"AA. It is essential that Plaintiff secures the declaration of this Court, that

---

6. Section 9–7–901 is a codification of § 1, Ch. 153, Session Laws of Wyoming 1977 as amended by §§ 2 and 3 of Ch. 159 and §§ 2 and 3 of Ch. 160, Session Laws of Wyoming 1979, and later amended by § 1 of Ch. 56, Session Laws of Wyoming 1980.

7. Paragraphs 23 through 25 of the Counterclaim concerned failure to set forth criteria or requirements pursuant to 30 U.S.C. § 191.

8. Paragraphs 32 through 35 of the Counterclaim concerned the potential for the bonds to be considered arbitrage bonds. Paragraphs 36 and 37 of the Counterclaim concerned the constitutionality of Chapter 159, Session Laws of

the proposed bond financing is valid and constitutional in all respects in order for Plaintiff to issue and sell the bonds.

"BB. Plaintiff is entitled to a declaration of its rights, status and legal relations with respect to Chapters 159 and 160, Resolutions A and B, Series A and B Bonds and the State Constitution under the Uniform Declaratory Judgment Act, W.S.1977 § 1–37–101, *et seq.*

"CC. The 1980 Wyoming Legislature adopted HB 104, which attempted to modify the existing statutory arrangements for distribution of the State's share of federal mineral royalties, as provided in § 9–7–901. The general purpose of this modification was fiscal relief for local governments, relief of a sort not directly related to the purposes of Chapters 159 and 160. Governor Herschler vetoed HB 104, asserting that this modification would divert revenues from other presently-needy recipients.

"DD. The State of Wyoming could raise additional revenues for capital construction requirements, fiscal relief, or other purposes, by increasing the State severance tax on some or all minerals mined or otherwise produced in the State.

"EE. Mr. Larry Hart is, and was at all times pertinent hereto, retained as financial advisor to the Wyoming Farm Loan Board. He is not a state official.

"FF. Exhibit F is a 7 November 1979 letter from Mr. Hart to Mr. Oscar Swan, Land Commissioner and Secretary of the Farm Loan Board. This letter reports the findings of Mr. Hart's investigations on behalf of the Farm Loan Board. Exhibits V and VI of the letter show projected revenues to the State, and, for Chapters 159 and 160, revenues before debt service requirements, pursuant to W.S.1977 § 9–7–901; an estimated debt service requirement; and estimated revenues available after debt service. Other

Exhibits of the letter report the results of Mr. Hart's statewide survey of capital needs.

"GG. The capital construction requirements which are addressed by Chapters 159 and 160 cannot be met in time to satisfy the legitimate present needs of potential recipients through revenues available to the state from presently-designated portions of the State's share of federal mineral leasing royalties or other presently-available sources of state revenue.

"HH. Should the present source of funds fail to provide adequate revenues for repayment of the bonds, there would be pressure on the government of the State of Wyoming to maintain the integrity of the bonds. This could be attempted by modifying the statutory arrangements for distribution of the State's share of federal mineral leasing royalties (depending on the magnitude of reduction of the State's share), by redemption of the bonds, or by other means. Pressures to maintain the integrity of the Capitol Facilities Bonds led the Legislature to authorize a redemption of those bonds after the *Witzenburger* decision. Pressures to maintain the integrity of bonds exist whenever the revenue source pledged to pay a bond issue fails, including the failure of revenues from a self-liquidating project.

"II. The bond statutes provide for the funding of a reserve fund from bond proceeds or current revenues credited to the program to pay approximately one year's principal and interest on any bond issue. If the Federal Government changes the formula for payment of mineral royalties to the state, so that revenues are inadequate to cover debt service on the bonds and it takes more than one year to resolve the problem, so that the state is not able to meet principal and

Wyoming 1979, inasmuch as it was a part of the statewide system of financing for public schools and subject to the issue presented in

*Washakie County School District Number One v. Herschler*, Wyo., 606 P.2d 310 (1980), i. e., that it denied equal educational opportunity.

interest payments on the bonds when due, the following are possible:

"1. It would be very difficult for the Farm Loan Board or the State to sell additional issues in the future secured by the same revenue source unless elaborate measures were taken to enhance the security of such a future issue.

"2. While the interest rate on and the ratings of other State of Wyoming issues should be determined only after careful examination of the structure of and security for the new issue, and not be automatically affected because of a bad experience with a previous issue, there may be investor resistance for a period of time to State issues once it becomes public knowledge that a State issue is in default. Such resistance could adversely affect ratings and interest rates for other bonds issued by the State of Wyoming for a period of time.

"JJ. The Wyoming Department of Economic Planning and Development (DEPAD) is a state agency.

"KK. Since the inception of this decade's energy boom, DEPAD has been involved in measures to mitigate the social and economic impacts of energy development, on a statewide basis. This involvement has included:

"1. Planning and planning assistance for local governments, in consultation with them.

"2. Advice to the Wyoming Farm Loan Board in identifying and selecting projects for funding.

"3. The routine coordination of many state and federal sources of financial assistance, most with limited authority and funds, to maximize the effect of government resources on local problems statewide.

"4. Implementation of the Farmers' Home Administration Section 601 Impact Mitigation Program, using the specific federal criteria for identifying and selecting projects which are unique to the Section 601 program.

"LL. DEPAD maintains a current list of capital facilities needs throughout the state, and maintains communications with local governments regarding local needs throughout the state.

"MM. DEPAD was at no time consulted in the selection of projects identified in the bond resolutions to be adopted pursuant to Chapters 159 and 160. Mr. Hart did review and consider applications for assistance from local entities which were on record with the Farm Loan Board.

"NN. Plaintiff admits that the listed projects are under consideration by Plaintiff and that Plaintiff will determine at the proper time whether the funding of these projects or other projects from bond proceeds will be in compliance with law. Prior to final selection of projects for disbursement of bond proceeds, the Farm Loan Board shall promulgate rules and regulations specifying the criteria and methods by which projects will be selected for funding.

"OO. At a minimum, these regulations shall provide for statewide public notice of said criteria and methods, and statewide opportunity to submit project proposals for funding.

"PP. These rules and regulations shall incorporate procedures for the use of such technical expertise as may be available to the Executive Department of the State of Wyoming in review and selection of projects for funding.

"QQ. The bonds have not been and will not be submitted to a vote of the people, and have not been and will not be by them approved in that manner."

The ultimate question is whether or not bonds issued pursuant to Chapters 159 and 160, Session Laws of Wyoming 1979, as amended by Chapter 56, Session Laws of Wyoming 1980, constitute a debt within the state debt limitations of the Wyoming Constitution.

Such bonds are to be paid only from revenue obtained from the federal govern-

ment pursuant to 30 U.S.C. § 191. (See Stipulation H, supra). Such revenue does not result from any form of taxes levied by the State of Wyoming. The holder of the bonds cannot look to any source funded by state taxes for payment of bond obligations. They are, therefore, not subject to the constitutional debt limitations.

If there is no present legal potential that an obligation will have to be paid from revenues resulting from the exercise by a governmental entity of its power to tax, the obligation is not a debt within the constitutional provisions relative to the amount of debt and voter approval of the debt. If such potential does exist, the obligation is such a debt.

■ This proposition is fundamental to the "revenue bond" or "special fund" doctrine. Such doctrine is to the effect that if an obligation is payable *solely* from revenues resulting from the project for which the obligation was incurred and not from taxes, a debt within the constitutional limitations is not incurred. *Frank v. City of Cody*, Wyo., 572 P.2d 1106 (1977); *Powers v. City of Cheyenne*, Wyo., 435 P.2d 448 (1967), rehearing denied 436 P.2d 961 (1968); *Laverents v. City of Cheyenne*, 67 Wyo. 187, 217 P.2d 877 (1950); *Snyder v. City of Cheyenne*, 79 Wyo. 405, 334 P.2d 750 (1959).

■ *Arnold v. Bond*, 47 Wyo. 236, 34 P.2d 28 (1934) reflects a situation similar to that here presented. In that case, the Wyoming Legislature had authorized the Trustees of the University of Wyoming to borrow monies from the United States government for the construction of a Liberal Arts building on campus, and to contract for the repayment of said loan solely by the creation of a first lien upon the income of the University permanent land fund, an account containing monies derived from the sale of lands donated to the state by the federal govern-

ment under the Act of Admission of the State of Wyoming. This legislative authorization went on to provide that nothing in the Act should be construed as empowering the Trustees of the University to obligate in any way the general credit, or any other funds, property or assets of the State of Wyoming.[9] We there said:

"The question is whether either of these sections [Art. XVI, §§ 1 and 2, Wyoming Constitution] are violated by the legislative act in question and by the proposed loan. There is no such violation, of course, if the indebtedness is not a state debt, or if, by reason of the payment to be made only out of the income of the University fund, liability thereon is limited *so as not to be a charge on the taxpayers of the state.* * * * The majority of courts have held that an obligation similar to that involved in the case at bar is not a debt of the state. * * * In the case of *State ex rel. v. Clausen*, supra, 134 Wash. 196, 235 P. 364, 366 (1925), * * * the court said:

" 'The legislative act under discussion expressly provides that the principal and interest of the bonds authorized shall be payable only from revenues hereafter received from the lease and sale of the granted lands. In no possible way is the credit of the state involved. Not one dollar of its general property can be used to discharge those bonds or the interest on them. *Not one dollar of taxes can be put to that purpose.* * * * Its (the state's) only obligation under this act is to see that all the revenues hereafter received from the lease or sale of the granted lands shall be applied towards the payment of these bonds and their interest. On no principle of law can it be said that under these circumstances any debt has been contracted by or on behalf of this state.'

\* \* \* \* \* \*

(see Stipulation H, supra).

---

**9.** The resolutions adopted in this matter (see Stipulation F, supra) have similar restrictions

"We are inclined to agree with the opinion of the majority of the courts. The legislative act in question here specifically provides that only the income from the University land fund, and *not the general credit of the state or any property whatsoever except such income, shall be obligated under the loan*. We do not see why we should not give this language its natural meaning, or construe the act as creating a greater obligation, moral or otherwise, than it purports to create, when the terms thereof are clearly known before the proposed loan is made. * * * *" (Emphasis and bracketed material supplied.) 34 P.2d at 31, 32.

In *Witzenburger v. State ex rel. Wyoming Community Development Authority*, supra, we held unconstitutional a pledge of a fund to secure issuance of bonds which fund contained some money obtained through state excise taxes. But we there recognized the defect to be in the legal use or commitment or potential legal use or commitment of *tax money* to secure payment of the bond obligation. We said:

"As will develop during the course of this opinion, *it is the use of excise tax money* granted by the Wyoming farm loan board under authority of this section to liquidate bonds of the Authority over extended periods of years *that creates a debt* prohibited by the limitations of § 2, Article XVI, Wyoming Constitution." (Emphasis supplied.) 575 P.2d at 1108.

" * * * The *Laverents* court especially distinguished cases, such as we have here before us, where the fund is partially fed by a tax. *When nourished by general tax revenues*, the special-fund doctrine becomes subject to constitutional limitations which inhibit its utility. See also *Frank v. City of Cody*, supra. There can be no constitutional violation when a project is selfsustaining, *without the aid of taxes.*" (Emphasis supplied.) 575 P.2d at 1118.

" 'That the special fund doctrine is a useful and valid tool of government is apparent when one thinks of all of the institutions and devices of government supported by it. But *the true test of its application here is not what comes out of the fund, but what goes into it.* If the revenues in it derive exclusively from the operaton of the device or organ of government financed by the fund, as in the case of a toll bridge, * * * any securities issued solely upon the credit of the fund are not debts of the state, but debts of the fund only. *But if the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state.*'" (Emphasis supplied.) 575 P.2d at 1122, and quoting from *State v. Martin*, 62 Wash.2d 645, 384 P.2d 833 (1963), specifically adopting it as law of Wyoming.

"A saving feature of the legislative plan in regard to the mortgage purchase and loan or lenders program is that *no state tax money is initially funneled into repayment of bonds as a part of revenue.* * * * *" (Emphasis supplied.) 575 P.2d at 1131.

It is not a new proposition that a debt is not created within the restrictions of §§ 1 and 2, Art. XVI, Wyoming Constitution, by issuance of statutorily authorized bonds which are to be liquidated only by funds other than those derived from taxes.

Appellee acknowledges that the language of the questioned enactments, the resolutions and the proposed bonds is clear in giving notification that the bondholders must look only to revenues received pursuant to 30 U.S.C. § 191 for payment of the bonds and that they cannot look to general funds or other funds for such payment. See Stipulations H, N and O, supra. However, he contends that there will be a moral obligation to pay the bonds from general funds in the event of such default. See Stipulations K, M, HH and II, supra. He

contends that this brings the bonds within the debt prohibitions of §§ 1 and 2, Art. XVI, Wyoming Constitution.

We cannot speculate on the potential for moral obligations. The risks of the bondholder are premised upon the terms of the bond, and the legal obligations of the issuer are there prescribed. We can look only at the legal ramifications of the reserved questions presented to us. We note, however, that appellee's argument in this respect is equally applicable to revenue or special fund bonds and, if accepted, would have the effect of nullifying their use. They are regularly issued by the state and by its subdivisions, and we have approved their use. *Frank v. City of Cody,* supra; *Powers v. City of Cheyenne,* supra; *Laverents v. City of Cheyenne,* supra; *Snyder v. City of Cheyenne,* supra.

Appellee also argues that the revenue from 30 U.S.C. § 191 is "remarkably similar" to state mineral excise levy and that it is used for expenses which would ordinarily have to be borne by taxes. He contends that should the 30 U.S.C. § 191 revenue be changed or discontinued (see Stipulation K, supra), general revenue would have to be used to pay the expenses previously funded through this revenue. He concludes from that that 30 U.S.C. § 191 funds are part of the treasury of the state and included in the term "taxes." Such reasoning is strained and we cannot adopt it. Of course, the 30 U.S.C. § 191 money is used for many things in lieu of tax money. But that fact does not make the 30 U.S.C. § 191 funds into taxes. The oft-quoted definition of taxes as adopted in *Witzenburger v. State ex rel. Wyoming Community Development Authority,* supra, 575 P.2d at 1126, is:

"' * * * the enforced proportional contributions from persons and property, levied by the state by virtue of its sovereignty for the support of government and all public needs.' * * *"

The 30 U.S.C. § 191 revenue does not meet this criterion and is not taxes.

Reference by appellee to the holding in *Application of Oklahoma Educational Television Authority,* Okl., 272 P.2d 1027 (1954)[10] is not pertinent to this case inasmuch as it turned on an Oklahoma constitutional provision which prohibited "'* * * creation of any debt or obligation * * * regardless of its form *or the source of money* from which it is to be paid. * * *'" (emphasis supplied). Section 23, Art. 10, Oklahoma Constitution. Our constitution does not contain the "source of money" limitation.

Appellee recites from *Witzenburger v. State ex rel. Wyoming Community Development Authority,* supra, 575 P.2d at 1127:

" * * * The basic intent and purpose of § 2, Article XVI, Wyoming Constitution, limiting incurrence of state debt beyond the current year's taxes is to prohibit the legislature from binding subsequent legislatures to make appropriations of money in subsequent fiscal years. * * *"

He argues that this proposition is violated by the commitment of 30 U.S.C. § 191 money to redeem the authorized bonds inasmuch as it prevents future legislatures from use of such money elsewhere.

Appellee fails to emphasize the words "beyond the current year's taxes" in the above quotation from *Witzenburger.* The quotation refers to *tax* money. There are only a few exceptions to the inability of one legislature to bind its successors—by amendment of formerly enacted laws or otherwise. We are here concerned with one of those exceptions.

"There can be no vested right in an existing law which precludes its change. In this respect, it has been declared that it is the function of the legislature, and of the legislature alone, to change rules of law, that each subsequent legislature has

10. An enactment was held unconstitutional which authorized issuance of bonds to be paid out of a public building fund. The fund included monies received from oil, gas and mineral leases.

equal power to legislate upon the same subject, and that one legislature cannot abridge the power of a succeeding legislature. It is a well-established principle that legislative power includes the power to amend existing laws, as well as the power to enact laws, *subject, of course, to constitutional restrictions and inhibitions, such as the prohibition against the extinguishment of vested rights which have been acquired under the former law, or the impairment of the obligations of a contract, or the denial of due process of law.*" (Emphasis supplied.) 73 Am. Jur.2d Statutes § 34 (1974).

"Vested rights" and "impairment of the obligations of a contract" apply to all proper bond issues.

"The federal constitution and many state constitutions contain provisions prohibiting laws impairing the obligation of contracts, and *public bonds, including the bonds issued by the various states of the Union and their political subdivisions, have been uniformly and consistently held to constitute contracts* within the purview of such provisions. If the obligation of the contract contained in such bonds is impaired by laws of the state passed subsequently, such laws are invalid as attempted to be applied to such bonds. *After the rights of public bondholders have become vested under their contract, the legislature has no power to alter such contract rights to the detriment of those who dealt with the public body upon the faith of the authority granted by the legislature to such body,* as, for example, in seeking to remove from such bonds a statutory exemption from state taxation which existed when they were issued. The value of a bond contract cannot be diminished by subsequent legislation. The impairment is not one of degree, but *any encroachment in any respect upon the obligation cannot be*

permitted." (Emphasis supplied.) 64 Am.Jur.2d Public Securities and Obligations § 28 (1972).

We appreciate appellee's concern in maintaining Wyoming as a "pay as you go" state. The near bankruptcy situations of governmental agencies in other parts of the country and the continually rising debt of the federal government justify his concern. Sections 1 and 2, Art. XVI, Wyoming Constitution, protect the "pay as you go" status, but we cannot extend those protective provisions by judicially amending the constitution to provide as does that of Oklahoma. Such amendment, if desired, must be accomplished by other means. On the other hand, we note the economic advantage of borrowing or of issuing bonds at fixed rates of interest in times of inflation such as now exist. But again our decision in this matter must be based only on existing law, leaving such considerations to those in the other branches of our government to whom such responsibilities are delegated.

Finally, we note the concern over the reserved questions expressed by the Trustees of the University of Wyoming appearing as amicus curiae. Our answers to those questions should alleviate their concerns, and we will not try to refine the problem as it relates to them.

For the foregoing reasons, we answer "no" to each of the reserved questions.