**PUERTO RICO PORTS AUTHORITY,**
Plaintiff, counterdefendant,

v.

**M/V "MANHATTAN PRINCE",**
Defendant, Counterclaimant,
and Third-party Plaintiff,

v.

**CROWLEY TOWING & TRANSPORTATION CO., Oscar Camacho, ABC Insurance Company, and XYZ Insurance Company, Third-party Defendants.**

**SUJEEN TRADING PTE.,
LTD., Plaintiff,**

v.

**CROWLEY TOWING & TRANSPORTATION CO., et al., Defendants.**

**SUJEEN TRADING PTE., LTD.,
Third-party Plaintiff,**

v.

**Oscar CAMACHO, ABC Insurance, et al., Third-party Defendants.**

**Civ. Nos. 85–1755 HL, 85–1776 HL.**

United States District Court,
D. Puerto Rico.

Sept. 4, 1987.

Eduardo Castillo Blanco, Castillo-Blanco & Miranda, Hato Rey, P.R., for plaintiffs.

Héctor Cuebas Tañón, Harold D. Vicente, Santurce, P.R., for Sujeen Trading Pte., Ltd.

Harry A. Ezratty, San Juan, P.R., for third-party defendant Oscar Camacho.

William A. Graffam, San Juan, P.R., for third-party defendant Crowley Towing & Transp. Co.

Pedro Santiago Torres, San Juan, P.R., for P.R. Electric Power Authority.

## MEMORANDUM OPINION

LAFFITTE, District Judge.

This memorandum opinion is being issued in conjunction with the findings of fact and of law issued by the Court on August 11, 1987 following a weeklong bench trial. In that action arising from the allision of the M/V "Manhattan Prince" with the Puerto Nuevo dock the Court found that the pilot, Oscar Camacho, and the ship's owner, Sujeen Trading Pte. Ltd. ("Sujeen") were equally negligent and equally liable for damages. It was further ruled that the Puerto Rico Ports Authority ("PRPA") was not answerable for the pilot's negligence or liability, despite the fact that the ship's use of the pilot was compulsory. As this is a question of first impression in this jurisdiction, we proceed to explain the ruling in greater detail.

The issue is one of vicarious liability. Should the doctrine of *respondeat superior* apply to the relationship between PRPA and the pilot? The Court's previous opinion and order dated July 23, 1987 held that PRPA could not defend against liability on the basis of Law 151, 23 L.P.R.A. 2303(b) [1] because providing harbor pilot services is a proprietary, rather than governmental, function. The focus thus switched to PRPA's alternative defense that harbor pilots are not agents of PRPA, but merely independent contractors. As there were not sufficient facts in the record at that time concerning the relationship between PRPA and the pilot, the issue was left unresolved pending the trial. As a supplement to the testimony adduced at trial, the parties submitted a stipulation of facts on the relationship. Before proceeding to consider the facts, and as a means for evaluating them, some background jurisprudence is in order.

PRPA is attempting to maintain a delicate balance. It would like to maximize control over harbor pilotage without incurring liability for pilot negligence. Presumably, greater control would reduce the likelihood of pilot negligence and resulting damage to PRPA's facilities, to cargo interests and to ships. Yet, too much control, in the manner of an employment relationship, begets vicarious liability. The case law accumulated over the years in this area is a tale of governmental entities attempting to structure pilotage in such a way as to avoid liability, but exercise control.

The first structural solution was successful for a time. Many municipalities created corporations, ports authorities, and endowed them with the important task of operating their ports. As a means of controlling the port, protecting facilities, and promoting trade, many ports authorities were assigned the task of providing pilo-

---

1. 23 L.P.R.A. 2303(b) provides that damages caused by an employee or agent of PRPA are recoverable against the Commonwealth alone, unless the employee or agent was acting in the exercise of PRPA's proprietary rights.

tage. In addition, laws and regulations were enacted making pilotage compulsory in certain ports. Where pilotage was compulsory, a shipowner could not be held personally liable under a theory of *respondeat superior* for the negligent acts of pilots assigned to them, as they could be where pilotage was voluntary. *Homer Ramsdell Transportation Co. v. La Compagnie Generale Transatlantique,* 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901). For a time in the nineteenth century the notion of sovereign immunity, even for municipalities, was so deeply rooted that it never occurred to parties involved in a harbor allision to seek to hold the municipal authority which administered the pilotage regulations liable for pilot negligence. Gilmore and Black, *The Law of Admiralty,* 2nd ed. p. 598. That left only the ship itself answerable *in rem,* despite the fact that the allision was caused by a pilot compulsorily assigned to it. *The China,* 74 U.S. (7 Wall.) 53, 19 L.Ed. 67 (1868). Holding a ship liable *in rem* for damages occasioned while under its own power was also a powerful notion. Of course, the pilot could also be held personally liable, though this is seldom satisfactory to an injured party as most pilots are judgment-proof.

As government entities continued to expand their operations into heretofore private enterprises, however, the doctrine of sovereign immunity came to be restricted to instances where the entities were engaged in more traditional governmental functions. Armed with this distinction it was not hard to view a municipality's employment of pilots and rendering of pilotage services for a fee as a propietary function not entitled to sovereign immunity. Courts began to hold that a ports authority or city which employed compulsory pilots could be held liable for a pilot's negligent acts. *Workman v. Mayor of New York City,* 179 U.S. 552, 21 S.Ct. 212, 45 L.Ed. 314 (1900); *The Thielbek,* 241 F.

209 (9th Cir.1917); *U.S. v. Port Of Portland,* 147 F. 865 (D.Or.1906).

Vicarious liability was not an alternative that all ports wanted to live with.[2] The control was great, but so were the financial risks. A different arrangement was needed. The case of *City of Long Beach v. American President Lines,* 223 F.2d 853 (9th Cir.1955) involved just such a different arrangement. The City of Long Beach contracted with an independent company to provide compulsory pilots in its harbor. Under the terms of the contract the pilots' fees would be paid to Long Beach, which would retain 40% and remit 60% to the independent contractor. The court determined that this arrangement did not shield Long Beach from liability for damages to the ship caused by the pilot. A contract between the city and the shipowner for piloting services could be implied because of the actual contract between the city and the company which employed the pilots. The city owed a duty of due care to the shipowner who could proceed against the city in tort or in contract. Naturally, the pilot company could also be held in tort for the negligence of the pilot.

Sometime later a successful structuring was hit upon and implemented. Concentrating on more traditional governmental, regulatory functions, the State of Washington sacrificed some of the control over the pilots inherent in an employment or contractual relationship. "The pilots remain independent contractors, hired by the vessel." *State of Washington v. M/V Dilkara,* 470 F.Supp. 437, 439 (W.D.Wash. 1979). A State Board of Pilotage Commissioners was given broad and exclusive power to regulate and control the professional behavior of Washington pilots, including the issuance, revocation, and suspension of licenses, the promulgation of rules promoting efficient and competent pilotage services, and the enforcement of the rules. The court found it determinative that the state had no control of the pilots' actions (pre-

---

**2.** Some government entities are willing to incur liability for pilot negligence in order to retain the control inherent in the employment relationship. *See,* for example, 2 *Benedict on Admiralty,* sect. 8 (the United States exclusively liable in the Canal Zone; no action lies against pilot individually); *Societa Per Azioni v. City of Los Angeles,* 31 Cal.3d 446, 183 Cal.Rptr. 51, 645 P.2d 102 (1982) (L.A. and shipowner liable as dual employers of *voluntary* pilot).

sumably, while on the vessel) and that it neither garnered fees nor directly benefitted in any way from the contract between the pilot and vessel. Three years later similar arrangement was held to insulate the Sacramento-Yolo Port District from liability, *Kitanihon-Oi Steamship Co. v. General Construction Co.*, 678 F.2d 109 (9th Cir.1982), even though the Port District also had a hand in setting the standard pilot's fee schedule by conducting negotiations between the pilots and maritime steamship associations.

Puerto Rico is a compulsory pilot jurisdiction. 23 L.P.R.A. sect. 2412; *Campos v. Puerto Rico Sun Oil Co.*, 536 F.2d 970, 971 (1st Cir.1976). Whether PRPA can be held liable for pilot negligence on a theory of *respondeat superior* has not been decided in this jurisdiction. The District Court in *Getty Refining and Marketing v. Puerto Rico*, 531 F.Supp. 396 (D.P.R.1982), rev'd., 698 F.2d 1213 (1st Cir.1982), was faced with the issue but decided the case on other grounds. The Court in *Hanover Insurance Co. v. Liberian Oceanway Corp.*, 398 F.Supp. 104 (D.P.R.1975) denied a summary judgment motion on the issue of PRPA liability for pilot negligence because of a lack of evidence on whether the pilot was an independent contractor or an agent. In that regard, and to aid this Court in its exploration of the relationship between PRPA and the pilots, the parties have filed a "Stipulation Concerning Pilotage in Puerto Rico." Evidence was also presented at trial.

PRPA is empowered to control the pilot service in the harbors of Puerto Rico. 23 L.P.R.A. 2401 *et seq.* Only pilots licensed by PRPA may render pilot services, and all ships must take a pilot. PRPA charges a fee for the license and may revoke it or impose administrative fines on a pilot who violates the law or regulations enacted by PRPA. Section 2406 dictates that PRPA not issue a license until a careful examination of a person's qualifications. PRPA does not administer a written examination, but utilizes a point system taking into account U.S. Coast Guard rating, endorsements, and experience. PRPA is authorized to establish programs for pilot apprenticeship.

PRPA does not have the power to control the actions of the pilot while he is on the bridge. For the services of the pilot, the shipowner or agent pays a fee directly to the pilots and also into a trust fund, created by PRPA, for the pilots' pension. Fees are set by PRPA after a public hearing before a Hearing Officer named by the Secretary of Transportation and Public Works. The pilots set their own monthly schedule in advance and notify PRPA of it. Any last minute changes in the schedule are made among the pilots themselves. Ships have no choice between pilots. The pilots pay rent to PRPA for the use of their pilot house. Pilots provide their own pilot boats and other equipment.

■ On these facts it is clear that the relationship between PRPA and the pilots is not that of employer and employee. PRPA does not benefit financially or directly from the pilots' services. PRPA does not direct the method of performance of pilot services. *Respondeat superior* liability cannot attach to PRPA as an employer. As stated in *Hanover, supra* at 109–110, however, "even assuming the existence of a true 'independent contractor' relationship, there may be certain factors that may impose liability on the principal." The issue becomes the amount of control that PRPA retains over the pilots. We find that PRPA does not control pilotage in San Juan Harbor such that it can be held liable for pilot negligence.

■ PRPA's control is aimed at ensuring safe passage through the harbor. Its functions are related to licensing and the competency of pilots. PRPA acts like a public service commission, setting and enforcing standards within the industry (harbor services in general and pilotage in particular). The level of involvement is about the same as the ports authorities in *Kitanihon-Oi* and *M/V Dilkara.* No fee collection by PRPA and the absence of a contract between PRPA and the shipowner foreclose PRPA liability for pilot negligence. The one ostensible difference in the instant relationship from the one encountered in

*Kitanihon-Oi* is the manner of setting fees. PRPA conducts public hearings, then sets the fees. In *Kitanihon-Oi* the ports authority participated in negotiations between the pilot and shipowner interests. These two roles are somewhat different, but it would be hard to say which exhibits more involvement or control. Either way they do not involve the respective ports authorities to such an extent that they can be held liable for pilot negligence.

Because of the manner that compulsory pilotage is structured in the Commonwealth, PRPA is not liable for the damages caused by the negligence of a harbor pilot when maneuvering a vessel.

IT IS SO ORDERED.