**Jean C. DURNING, Marvin B. Durning, Plaintiffs–Appellees,**

v.

**CITIBANK, N.A., the First Boston Corporation, First Interstate Bank of Casper, Defendants,**

**and**

**Wyoming Community Development Authority, Defendant–Appellant.**

No. 90–35172.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1991.

Decided Dec. 9, 1991.

---

Bennet A. McConaughy, Paul L. Ahern, Jr., Foster, Pepper & Shefelman, Seattle, Wash., for defendant-appellant.

James A. Webster, Lynn D. Weir, Webster, Mrak & Blumberg, Seattle, Wash., for plaintiffs-appellees.

Before WALLACE, Chief Judge, O'SCANNLAIN, Circuit Judge, and BURNS,* District Judge.

O'SCANNLAIN, Circuit Judge:

The Wyoming Community Development Authority (the "Authority") appeals from the district court's denial of its motion to dismiss for lack of jurisdiction. The Authority contends that it is an arm of the sovereign state of Wyoming and is therefore absolutely immune from suit in federal court under the Eleventh Amendment to the Constitution. Although we acknowledge that the question is close, we disagree and affirm.

I

In 1975, the Wyoming State Legislature enacted the Wyoming Community Development Authority Act (the "Act"), 1975 Wyo. Sess. Laws ch. 188, § 1 (codified as amended at Wyo.Stat. §§ 9-7-101 to 125 (1977)). The Act established the Authority and granted it substantial powers to perform two primary functions: (1) to help to alleviate "a critical shortage of adequate housing and a lack of funds [from] private mortgage lending institutions of the State which are available to finance new and existing housing at reasonable rates" and (2) "to promote the economic welfare of the state and its residents by increasing employment, stimulating economic activity, augmenting sources of tax revenue, fostering economic stability and improving the balance of the State's economy." Wyo. Stat. § 9-7-102(a)(i)-(ii) (1977).

In December 1981, in furtherance of these goals, the Authority issued $75 million in tax-exempt bonds through and to a syndicate of underwriters. The bonds were issued to finance the purchase of moderately priced single family homes by persons of low and moderate incomes. In connection with the issue, the Authority disseminated an Official Statement, a disclosure document equivalent in most respects to a stock offering's prospectus.

The Official Statement disclosed the material terms of the offering, including the terms of redemption, and it indicated that redemptions would be made from specific sources of funds, including unexpended bond proceeds, mortgage prepayments, excess reserves, and excess revenues.

Appellees Marvin B. and Jean C. Durning, who represent the plaintiff class, purchased four of these bonds, each with a face value of $5,000, an interest rate of 13.375%, and an apparent maturity date of June 1, 1996. The Durnings made their purchase upon the recommendation of their broker and with the apparent understanding that the bonds were not redeemable before 1991. Mr. Durning received the Official Statement before finalizing his purchase, and his examination of the document apparently confirmed his understanding about the timing of redemptions. Nonetheless, in June 1983, the Authority recalled $28 million worth of the bonds, and in 1985, it recalled another $4 million, including one of the Durnings' bonds. Immediately after the second of these redemptions, the price of the bonds declined significantly in the secondary market, and the Durnings allegedly lost $4,000 in foregone interest payments.

The Durnings cried foul. On July 15, 1985, they filed the present action on behalf of themselves and others similarly situated. Relying primarily upon the implied cause of action under section 10(b) of the Securities Exchange Act of 1934, the Durnings charged the Authority; the lead underwriter, First Boston Corporation; and other institutions associated with the bonds with securities fraud. They alleged that the Official Statement did not adequately disclose that the bonds were redeemable prior to 1991 and that the redemptions of 1983 and 1985 were therefore impermissible. Since the Durnings filed their complaint, the Authority has continued to recall its bonds, including two more of the Durnings' bonds, and it has now retired approxi-

---

* The Honorable James M. Burns, Senior United States District Judge for the District of Oregon, sitting by designation.

mately $65 million out of the original $75 million issued.

On January 7, 1986, the district court dismissed the Durnings' action for failure to state a claim. The court held that the Official Statement unambiguously informed the investors that the bonds were indeed redeemable prior to June 1, 1991. *Durning v. First Boston Corp.*, 627 F.Supp. 393 (W.D.Wash.1986). On appeal, however, this court reversed and remanded. We held that "[t]he case at bar is not a case where the issue of adequate disclosure could be determined by a trial court as a matter of law" and that "[a] jury could conclude that a reasonable investor might fail to understand that the bonds are redeemable [prior to June 1, 1991 if funds are sufficient]." *Durning v. First Boston Corp.*, 815 F.2d 1265, 1269 (9th Cir.), *cert. denied*, 484 U.S. 944, 108 S.Ct. 330, 98 L.Ed.2d 358 (1987).

On remand, the Authority raised the subject of the current dispute. It moved to dismiss all the claims that had been raised against it on the ground that it was immune from suit in federal court under the Eleventh Amendment. Upon the recommendation of a magistrate judge, the district court denied that motion on two grounds. The court held first, that the Authority is not an arm of the state of Wyoming and therefore is not entitled to invoke the defense of sovereign immunity; and second, that Congress has affirmatively abrogated any applicable state immunity under the federal securities laws.

The Authority then filed this timely appeal.

## II

The district court had proper jurisdiction, if at all, under the general federal question statute, 28 U.S.C. § 1331, and the federal securities laws, 15 U.S.C. §§ 77v, 78aa. This court has proper jurisdiction under 28 U.S.C. § 1291. Whether a party is immune from suit under the Eleventh Amendment is a question of law that we review de novo. *BV Eng'g v. University of Cal., Los Angeles*, 858 F.2d 1394, 1395 (9th Cir.1988),

*cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 859 (1989).

Although the denial of a motion to dismiss is not normally appealable, we have held that the denial of a motion to dismiss on grounds of sovereign immunity, if colorable, is immediately appealable under the collateral order doctrine first articulated in *Cohen v. Beneficial Industrial Loan Corp.*, 337 U.S. 541, 545–47, 69 S.Ct. 1221, 1225–26, 93 L.Ed. 1528 (1949). *See Marx v. Government of Guam*, 866 F.2d 294, 296 (9th Cir.1989). As the Supreme Court has explained in cases discussing the related doctrine of official immunity, the denial of a substantial claim of absolute immunity is appealable before final judgment because the essence of absolute immunity is its possessor's entitlement not to have to answer for or even to defend conduct that it necessarily would have to defend in the course of any proceedings in pursuit of a final judgment; without immediate reviewability, rejection of a valid claim to immunity from suit would, in effect, not be reviewable at all. *See Mitchell v. Forsyth*, 472 U.S. 511, 525, 105 S.Ct. 2806, 2815, 86 L.Ed.2d 411 (1985); *Nixon v. Fitzgerald*, 457 U.S. 731, 742–43, 102 S.Ct. 2690, 2697, 73 L.Ed.2d 349 (1982); *see also Marx*, 866 F.2d at 296.

## III

### A

The Eleventh Amendment to the United States Constitution provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. Although by its terms the Eleventh Amendment only withholds article III jurisdiction from cases predicated upon citizen-state diversity, the Supreme Court has judicially extended its reach to bar federal courts from deciding virtually any case in which a state or the "arm of a state" is a defendant—even

where jurisdiction is predicated upon a federal question—unless the state has affirmatively consented to suit. *See Hans v. Louisiana,* 134 U.S. 1, 9–21, 10 S.Ct. 504, 504–09, 33 L.Ed. 842 (1890) (Eleventh Amendment shields states from suits brought by their own citizens); *State Highway Comm'n v. Utah Constr. Co.,* 278 U.S. 194, 199, 49 S.Ct. 104, 106, 73 L.Ed. 262 (1929) (Eleventh Amendment shielded state agency that was "but the arm or *alter ego* of the State with no funds or ability to respond in damages"); *see also Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 238–40, 105 S.Ct. 3142, 3145–46, 87 L.Ed.2d 171 (1985).

Despite the breadth of the Eleventh Amendment's reach, not all state-created or state-managed entities are immune from suit in federal court. First, an entity may be organized or managed in such a way that it does not qualify as an arm of the state entitled to sovereign immunity. *See, e.g., Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400–02, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979); *Port Auth. Trans–Hudson Corp. v. Feeney,* 495 U.S. 299, 110 S.Ct. 1868, 1876–80, 109 L.Ed.2d 264 (1990) (Brennan, J., concurring). Second, the state can affirmatively waive the sovereign immunity that would otherwise cloak the defendant entity. *See, e.g., Atascadero,* 473 U.S. at 238, 241, 105 S.Ct. at 3145, 3146. Third, Congress can expressly abrogate state sovereign immunity in fields of federal regulation in which the states voluntarily choose to participate. Congress can effect such an abrogation through an unequivocal expression to that effect pursuant to its powers under section 5 of the fourteenth amendment, *see, e.g., Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), and, arguably, pursuant to its powers under the commerce clause, *see Pennsylvania v. Union Gas Co.,* 491 U.S. 1, 13–23, 109 S.Ct. 2273, 2280–86, 105 L.Ed.2d 1 (1989) (plurality opinion).

In defense of the district court's ruling, the Durnings contend that all three of these rationales bar the Authority's claim to immunity here. Because we agree that the Authority is not an arm of the state of Wyoming for purposes of the Eleventh Amendment, we do not address the Durnings' contentions that Wyoming has affirmatively waived its immunity or that Congress has expressly abrogated the state's immunity under the federal securities laws.

**B**

█ Under the "arm of the state" doctrine, a state agent or agency is immune from suit under the Eleventh Amendment because "the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit even though individual officials [or state entities] are nominal defendants." *Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945); *see also Ronwin v. Shapiro,* 657 F.2d 1071, 1073 (9th Cir.1981). Sovereign immunity cloaks the state agent or agency because, if the plaintiff prevails, "[s]uch a judgment would have the same effect as if it were rendered directly against the State for the amount specified in the complaint." *Smith v. Reeves,* 178 U.S. 436, 439, 20 S.Ct. 919, 920, 44 L.Ed. 1140 (1900). We have held that:

To determine whether a governmental agency is an arm of the state, the following factors must be examined: [1] whether a money judgment would be satisfied out of state funds, [2] whether the entity performs central governmental functions, [3] whether the entity may sue or be sued, [4] whether the entity has the power to take property in its own name or only the name of the state, and [5] the corporate status of the entity. *Jackson v. Hayakawa,* 682 F.2d 1344, 1350 (9th Cir.1982). To determine these factors, the court looks to the way state law treats the entity. *Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280 [97 S.Ct. 568, 572–73, 50 L.Ed.2d 471] ... (1977); *Rutledge v. Arizona Bd. of Regents,* 660 F.2d 1345, 1349 (9th Cir.1981), *aff'd sub nom. Kush v. Rutledge,* 460 U.S. 719 [103 S.Ct. 1483, 75 L.Ed.2d 413] ... (1983).

# 1424

*Mitchell v. Los Angeles Community College Dist.*, 861 F.2d 198, 201 (9th Cir.1988), *cert. denied*, 490 U.S. 1081, 109 S.Ct. 2102, 104 L.Ed.2d 663 (1989). Careful consideration of these five factors demonstrates that the Wyoming Community Development Authority is not an arm of the state of Wyoming.

## 1

In *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court held that the Eleventh Amendment precludes federal courts from adjudicating suits by private parties against states and state entities where a judgment from the plaintiff would have to be satisfied out of public funds from the state treasury. 415 U.S. at 663, 94 S.Ct. at 1355–56.[1] In recognition of *Edelman*, prior decisions by this court have held that "the source from which the sums sought by the plaintiff must come is the most important single factor in determining whether the Eleventh Amendment bars

federal jurisdiction." *Rutledge*, 660 F.2d at 1349; *Jackson*, 682 F.2d at 1350; *Ronwin*, 657 F.2d at 1073.

■ On one level of analysis, the question whether a monetary judgment against the Authority would have to be satisfied out of state funds is tautological and self-answering: if the Authority is an arm of the state, then by definition a judgment against the Authority would be a judgment against the state. For a consideration of this first and most important factor to be meaningful, therefore, the question must be whether a judgment against the defendant entity under the terms of the complaint would have to be satisfied out of the limited resources of the entity itself or whether the state treasury would also be legally pledged to satisfy the obligation.[2] Under this standard, the first *Mitchell* factor indisputably weighs against a finding of sovereign immunity.

■ The Official Statement, pursuant to which the Durnings' bonds were issued, unequivocally indicates on its face and in

**1.** The Eleventh Amendment permits some suits against state officers for prospective injunctive relief. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Because the Durnings sought only damages, *Young* does not apply here.

**2.** The Authority relies upon *Hutchison v. Lake Oswego School District*, 519 F.2d 961 (9th Cir. 1975), *vacated*, 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977), for the proposition that this first *Mitchell* factor weighs in favor of a finding of sovereign immunity if the amount of a judgment for the plaintiff would likely exceed the limited resources of the defendant entity. In support of this proposition, the Authority cites *Hutchison's* statement that "[t]he most important factor in determining whether a particular agency is the 'alter ego' of the State for Eleventh Amendment purposes is 'whether payment of a judgment will have to be made out of the state treasury, i.e., whether the fund in question has both the independent power *and resources* to pay the judgment without further action by the state legislature or other governmental officer.'" *Id.* at 966 (quoting *Bowen v. Hackett*, 387 F.Supp. 1212, 1221 (D.R.I.1975)) (emphasis added).

We believe that the Authority has overstated the applicable standard. The relevant question is whether the state would have a *legal liability* to pay the judgment, not whether the defendant entity would have the *practical ability* to pay it. The latter inquiry would be relevant to a deter-

mination of whether the defendant entity is judgment proof, but whether the entity is practically unable to pay some or all of the judgment says nothing about sovereign immunity or whether the state treasury is *legally pledged* to the debt. Moreover, the Authority's understanding of this factor would lead to the absurd results that the size of the plaintiff's injury would weigh *in favor* of a finding of the defendant's immunity: the larger the loss caused by the defendant's conduct, the lesser its chances of being able to satisfy a judgment out of its own funds and—in the Authority's reading—the greater its chances of being found immune.

The Authority's reliance on *Hutchison* is also not well taken for another reason. The Supreme Court expressly vacated the *Hutchison* decision in *Lake Oswego School District v. Hutchison*, 429 U.S. 1033, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977). Although the Authority contends that the decision was "vacated on other grounds," we find that contention curious. A decision may be *reversed* on other grounds, but a decision that has been *vacated* has no precedential authority whatsoever. *See O'Connor v. Donaldson*, 422 U.S. 563, 578 n. 2, 95 S.Ct. 2486, 2495 n. 2, 45 L.Ed.2d 396 (1975) ("Of necessity our decision vacating the judgment of the Court of Appeals deprives that court's opinion of precedential effect, leaving this Court's opinion and judgment as the sole law of the case."); *see also United States v. Clark*, 617 F.2d 180, 184 n. 4 (9th Cir.1980); *Quinn v. Robinson*, 783 F.2d 776, 779 n. 20 (9th Cir.1986).

three separate places that the Wyoming state treasury is not liable for a breach of the terms of the issue:

> Neither the faith and credit nor the taxing power of the State [of Wyoming] or any political subdivision ' thereof is pledged to the payment of the Bonds. The State is not liable on the Bonds and the Bonds are not a debt of the State. The Act does not provide any procedure for the State to make appropriations for deposit to any fund or account established under the Indenture. The Authority has no taxing power.

Official Statement at 3; *see also id.* at 1, 15. In addition, the Act unambiguously denies that the Authority's bonds are in any way a general obligation of the state: "All bonds issued by the authority are payable solely out of special funds consisting of all or part of its revenues, receipts, monies and assets, as designated in the proceedings under which the bonds are authorized." Wyo.Stat. § 9–7–107(b) (1977). The situation before us is therefore markedly different from the situation in *Ronwin*, where, in the course of concluding that the University of Arizona's Board of Regents did enjoy sovereign immunity, we noted that:

> Arizona has enacted a comprehensive scheme of risk management that includes provisions for payment of judgments obtained against "the state and its departments, agencies, boards and commissions...."

657 F.2d at 1073 (quoting Ariz.Rev.Stat. Ann. § 41–621 A.3 (Supp.1980)).[3]

In response to these arguments, the Authority contends that Wyoming's deliberate distancing of itself from the special obligations of the Authority has nothing to do with state sovereign immunity but rather represents an attempt by the state to invoke the "special fund doctrine" in order to evade state constitutional limits on the issuance of debt. Like many state constitutions, the Wyoming Constitution imposes substantive restraints on the state's power to incur indebtedness. *See* Wyo. Const. art. XVI. Under the special fund doctrine, "if an obligation is payable *solely* from revenues resulting from the project for which the obligation was incurred and not from taxes, a debt within the constitutional limitations is not incurred." *State ex rel. Wyoming Farm Loan Bd. v. Herschler*, 622 P.2d 1378, 1387 (Wyo.1981) (emphasis in original). By issuing obligations whose fulfillment is entirely dependent upon the revenues generated by those obligations, a state can avoid its constitutional restraints and issue more debt than it otherwise could. As originally established, however, the Authority's obligations were *not* special obligations of the Authority alone but rather were general obligations of the state. As such, they caused the state to exceed its own constitutional limits on the assumption of debt and the Wyoming Supreme Court therefore declared the Act unconstitutional as a matter of Wyoming law. *See Witzenburger v. State ex rel. Wyoming Comm. Dev. Authority*, 575 P.2d 1100 (Wyo.1978). In response to *Witzenburger*, the state legislature revised the Act to invoke the special fund doctrine so that obligations of the Authority would only be obligations of the Authority alone.

■ The Authority contends that any provisions in the Official Statement or the Wyoming statutes that purport to limit the state's liability on bonds issued by the Authority are relevant only to an internal state debate on constitutional limits on debt and have no bearing on the federal constitutional question before us. We disagree. The fact that the Wyoming state legislature has invoked the special fund doctrine for reasons prompted solely by the state constitution is not inconsistent with our holding that the application of that doctrine has federal constitutional ramifications. When a state entity is structured so that its

---

3. As the Durnings properly point out, the fact that the state may ultimately *volunteer* to pay the judgment if the Durnings prevail is immaterial; the question is whether the state treasury is legally obligated. *See Feeney v. Port Authority Trans-Hudson Corp.*, 873 F.2d 628, 631 (2d Cir. 1989), *aff'd on other grounds*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990); *Duckworth v. Franzen*, 780 F.2d 645, 650–51 (7th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986).

obligations are its own special obligations and not general obligations of the state, that fact weighs against a finding of sovereign immunity under the arm of the state doctrine; why the entity was so structured is of little consequence. Indeed, if the rationale underlying the Eleventh Amendment is to compel the federal judiciary's respect for a state's own sovereign constitutional authority, then the fact that a state feels compelled by its own constitution not to pledge its funds to support the obligations of a state entity counsels heavily against recognizing that entity as a sovereign arm of the state.

In short, we conclude that the first and most important *Mitchell* factor weighs against a finding of sovereign immunity.

### 2

Almost as strongly as the first *Mitchell* factor weighs in favor of the Durnings, however, the second factor—whether the entity performs central governmental functions—weighs in favor of the Authority. The Authority's authorizing legislation plainly states that "[t]he exercise of the powers granted by this act constitutes the performance of an essential governmental function," Wyo.Stat. § 9–7–112, and that "[t]his act constitutes a valid public purpose, of primary benefit to all citizens of the state of Wyoming." *Id.* § 9–7–102(a)(iii). The Wyoming Supreme Court has also characterized the functions performed by the Authority in terms that are indicative of a fundamental state activity. *See Witzenburger,* 575 P.2d at 1110–11. In Wyoming's eyes, therefore, it seems clear that the Authority performs central governmental functions. The treatment of the entity under state law must guide this court's inquiry. *See Mount Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977).

Although the Durnings contend with some force that the issuance of securities is itself not a central governmental function, we cannot fairly conclude that the issuance of securities is all that the Authority does. Under Wyoming law, it is clear that the Authority's primary purpose is to finance and to develop public housing—an indisputably governmental activity—and its revenue-raising efforts are merely one means by which it attempts to accomplish that otherwise purely governmental objective. *See* Wyo.Stat. § 9–7–102 (1977). Nor can we hold that the Authority is immune from suit with respect to some of its activities (i.e., what it does with its money) but not others (i.e., how it raises its money). To do so would impermissibly qualify sovereign immunity, which by its nature is absolute.

Finally, as the Authority correctly points out, our prior decisions have construed this second *Mitchell* factor broadly. For example, in *Mitchell* itself, we implied that the Los Angeles Community College District was a state agency entitled to Eleventh Amendment immunity because public education is a central governmental function, although the case actually only challenged the district's employment practices, which arguably are only tangentially related to that governmental function. *See Mitchell,* 861 F.2d at 201–02 Similarly, in *Ronwin* and *Rutledge,* we held that the Eleventh Amendment barred suits against Arizona's Board of Regents where the respective plaintiffs had alleged defamation by a state university law review, *see Ronwin,* 657 F.2d at 1072–74, and tortious conduct on the part of a state university football coach, *see Rutledge,* 660 F.2d at 1347–50.

In light of these considerations, we conclude that the second *Mitchell* factor weighs in favor of a finding of sovereign immunity.

### 3

■ If our decision had to rest entirely upon a consideration of the first two *Mitchell* factors, it would be considerably more difficult than it is. All three of the remaining factors, however, weigh strongly in favor of the Durnings' position and against the proposition that the Authority is an arm of the state for purposes of Eleventh Amendment analysis. Indeed, the Authority has provided almost no rebuttal to the Durnings' arguments on these three points. This is not surprising because there is al-

most no support for the Authority's position here. First, the Act unequivocally grants the Authority the power to "[s]ue and be sued" in its own right. Wyo.Stat. § 9–7–105(a)(i) (1977). This third factor therefore weighs in favor of the Durnings.[4]

### 4

Similarly, it is clear that the Authority has the power under Wyoming law to "[a]cquire or contract to acquire by grant, purchase, option or otherwise, real, personal or mixed property or any interest in property [and to o]wn, hold, clear, improve and rehabilitate, and sell, assign, exchange, transfer, convey, lease, mortgage or otherwise dispose of, or encumber the same." Wyo. Stat. § 9–7–105(a)(v–vi) (1977). Indeed, the Authority's authorizing legislation grants it extensive powers to contract in its own name and to organize and manage its own affairs independent of state interference. *See id.* §§ 9–7–105(a)(ii–iv), (vii–xxi); 9–7–106.

### 5

Finally, it is equally clear that the Authority has its own independent corporate identity: "The authority is a *body corporate* operating as a state instrumentality operated solely for the public benefit." *Id.* § 9–7–104(a) (emphasis added). Although appointed by the governor with the advice and consent of the state senate, its board of directors operates independently of any state agency. Perhaps nothing demonstrates this point more clearly than the Official Statement, which defines the "Authority" as a separate entity in contradistinction to the "State" and which expressly

distinguishes the former from the latter. *See* Official Statement at 2–5, 26.

Admittedly, the Authority is more closely tied to the state than an ordinary corporation. The governor and state treasurer serve on its board, and it is subject to the state's open meetings law. Nonetheless, its separate corporate status is clearly established.

Moreover, our determination that the Authority, as a free-standing entity issuing its own bonds, does not constitute the alter ego of the state for purposes of Eleventh Amendment analysis comports with the Supreme Court's analysis in similar cases. The Court's seminal decision in *Hans v. Louisiana,* which held that the Eleventh Amendment barred federal actions against unconsenting states even when brought by their own citizens, and its later landmark decision in *Principality of Monaco v. Mississippi,* 292 U.S. 313, 54 S.Ct. 745, 78 L.Ed. 1282 (1934), which held that the Eleventh Amendment barred federal actions against unconsenting states when brought by foreign nations, both involved actions to enforce obligations on government bonds. In both cases the Court held that the suits were barred by sovereign immunity, but in both cases the defendant entity was the state itself, which had issued bonds under its own name. Conversely, in *Mount Healthy,* the Supreme Court unanimously held that the defendant school board was not entitled to sovereign immunity because it was more akin to a city or county, which does not enjoy Eleventh Amendment protection, than it was to an arm of the state. *See* 429 U.S. at 279–81, 97 S.Ct. at 572–73; *see also Moor v. County of Alameda,* 411

---

**4.** It is important to distinguish the inquiry relevant to the third *Mitchell* factor from the "consent-to-suit" inquiry that governs the determination of whether a state has affirmatively waived its sovereign immunity. Under the former inquiry, to which we address ourselves here, the question is whether the defendant state entity has the organizational autonomy and legal independence to suggest that it is not simply an alter ego or arm of the state. The power to sue or be sued in one's own name is strongly suggestive of such autonomy and independence. Our determination on this point, however, must not be construed as or confused with a determination that Wyoming has affirmatively consented to suits against the Authority in federal court by

waiving whatever sovereign immunity the Authority might in fact enjoy. Under *Atascadero* and similar cases, a state's waiver of its sovereign immunity must be express and "unmistakably clear." *Atascadero,* 473 U.S. at 242, 105 S.Ct. at 3147. A mere statutory grant of the power to sue or be sued—although relevant to a determination of whether the entity is entitled to any immunity in the first place—is not enough to waive immunity from suits brought in federal court if it may fairly be construed as limited to a waiver of immunity in the state's own courts. *See Welch v. Texas Dept. of Highways and Public Transportation,* 483 U.S. 468 at 473–74, 107 S.Ct. 2941 at 2945–46, 97 L.Ed.2d 389 (1987).

U.S. 693, 717–21, 93 S.Ct. 1785, 1799–1801, 36 L.Ed.2d 596 (1973) (holding that the political subdivisions of a state are subject to federal diversity jurisdiction); *Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 363, 33 L.Ed. 766 (1890) (decided on the same day as *Hans* and holding that counties are not immune under the Eleventh Amendment from actions to enforce their bond obligations). In so holding, the Court found relevant and supportive the fact that the defendant school board could issue bonds in its own name:

> The issue here thus turns on whether the Mt. Healthy Board of Education is to be treated as an arm of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend. The answer depends, at least in part, upon the nature of the entity created by state law. Under Ohio law the "State" does not include "political subdivisions," and "political subdivisions" do include local school districts. Petitioner is but one of many local school boards within the State of Ohio. It is subject to some guidance from the State Board of Education and receives a significant amount of money from the State. But local school boards have extensive powers *to issue bonds* and to levy taxes within certain restrictions of state law. On balance, the record before us indicates that a local school board such as petitioner is more like a county or city than it is like an arm of the State. We therefore hold that it was not entitled to assert any Eleventh Amendment immunity from suit in the federal courts.

*Mount Healthy,* 429 U.S. at 280–81, 97 S.Ct. at 572–73 (citations omitted and emphasis added); *cf. Witzenburger,* 575 P.2d at 1110 (noting that, as originally constituted, the Wyoming Community Development Authority was designated a political subdivision of the state). More recently, the Court has emphasized that an entity's power to issue bonds in its own name strongly suggests that it has a legal independence from the state for Eleventh Amendment purposes:

> The rule to be derived from our cases is that the Eleventh Amendment shields an entity from suit in federal court only when it is so closely tied to the State as to be the direct means by which the State acts, for instance a state agency. In contrast, when a State creates subdivisions and imbues them with a significant measure of autonomy, such as the ability to levy taxes, issue bonds, or own land in their own name, these subdivisions are too separate from the State to be considered its "arms." This is so even though these political subdivisions exist solely at the whim and behest of their State.

*Port Auth. Trans–Hudson Corp.,* 110 S.Ct. at 1877 (Brennan, J., concurring).[5]

These observations support the impression that the Authority is a corporate entity sufficiently independent from the state so as not to be shielded by the Eleventh Amendment, and they bolster our determination that the fifth *Mitchell* factor weighs in favor of the Durnings and against a finding of sovereign immunity.

## IV

In light of the foregoing, we hold that the Wyoming Community Development Authority is not an arm of the state of Wyoming entitled to sovereign immunity under the Eleventh Amendment. A balance of the *Mitchell* factors compels this conclusion. Because we find this determination dispositive, we need not address the parties' arguments regarding state waiver and congressional abrogation.

AFFIRMED.

BURNS, Senior District Judge, dissenting:

I respectfully dissent.

---

5. Four justices joined in this pronouncement. Five other justices, the majority in the case, held that whatever immunity might apply to the entity in question had been explicitly waived, and they therefore did not address the arm of the state doctrine.