**ROYAL CARIBBEAN CORP. and Caribbean Cruise Line, Ltd., Plaintiffs, Appellants,**

v.

**PUERTO RICO PORTS AUTHORITY, et al., Defendants, Appellees.**

**No. 92–1079.**

United States Court of Appeals, First Circuit.

Heard June 2, 1992.

Decided Aug. 19, 1992.

Francisco G. Bruno with whom Marisa Rivera Barrera and Sweeting Gonzalez

Cestero & Bruno, Hato Rey, P.R., were on brief, for plaintiffs, appellants.

Jose Juan Torres–Escalera with whom Jiménez, Graffam & Lausell, San Juan, P.R., was on brief for defendants, appellees.

Before BREYER, Chief Judge, LAY,* Senior Circuit Judge, and O'SCANNLAIN,** Circuit Judge.

BREYER, Chief Judge.

This appeal raises the question whether the Puerto Rico Ports Authority enjoys Eleventh Amendment immunity from a tort action claiming that it negligently maintained Pier No. 6 in San Juan Harbor. We hold that the Authority, in operating and maintaining the San Juan docks, is not an "arm" of the Commonwealth government. Hence, it does not enjoy Eleventh Amendment immunity. We reverse a district court judgment to the contrary.

I

*Background*

On November 15, 1988, the M/S Sovereign of the Seas, a Norwegian passenger ship, was docking at Pier No. 6 in San Juan harbor. Suddenly, a steel post at the end of the pier broke, setting loose three mooring lines, which whipped across the ship, seriously injuring a crewman. Then, another line, attached to another steel post on the pier, snapped and struck a second crewman, seriously injuring him. Caribbean Cruise Line, the ship's owner, and Royal Caribbean Corporation, the ship's operator, compensated the crewmen. The crewmen assigned their legal rights and claims against the Puerto Rico Ports Authority to Royal Caribbean Corporation and Caribbean Cruise Line, which then brought this tort action against the Ports Authority. The Ports Authority claimed Eleventh Amendment immunity. The district court granted summary judgment in the Authority's favor. Royal Caribbean and Caribbean Cruise Line appeal.

* Of the Eighth Circuit, sitting by designation.

II

*The Standard*

The Eleventh Amendment bars a federal court suit against a state without its consent. U.S. Const. amend. XI. The question before us is whether the defendant in this case is " 'an arm [or alter ego] of the State partaking of the State's Eleventh Amendment immunity, or is instead to be treated as a municipal corporation or other political subdivision to which the Eleventh Amendment does not extend.' " *Ainsworth Aristocrat International Pty., Ltd. v. Tourism Co. of Puerto Rico*, 818 F.2d 1034, 1036 (1st Cir.1987) (quoting *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977)) [hereinafter *Ainsworth*]. We must answer this question in respect to the particular "type of activity" by the Ports Authority that is the object of the plaintiffs' claim, *Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 10 (1st Cir.1990), in this case the operation and upkeep of the piers and various other facilities in San Juan harbor. In doing so, we consider such matters as:

> local law and decisions defining the nature of the agency involved; whether payment of any judgment will come out of the state treasury; whether the agency is performing a governmental or proprietary function; the agency's degree of autonomy; the power of the agency to sue and be sued and enter into contracts; whether the agency's property is immune from state taxation and whether the state has insulated itself from responsibility for the agency's operations.

*M/V Manhattan Prince*, 897 F.2d at 9 (citing *Ainsworth*, 818 F.2d at 1037); *see also Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 400–02, 99 S.Ct. 1171, 1176–78, 59 L.Ed.2d 401 (1979); *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1423 (9th Cir.1991); *Figueroa–Rodriguez v. Aquino*, 863 F.2d 1037, 1044 (1st Cir.1988). While not providing a mechanical "test" for entitlement to Eleventh

** Of the Ninth Circuit, sitting by designation.

Amendment immunity, these factors help us assess whether the Ports Authority has acted more like a private company, or more like the Commonwealth's government, in conducting the activities relevant to this simple tort suit. *See M/V Manhattan Prince*, 897 F.2d at 10 (immunity depends in part on "nature of [plaintiff's] claim"); *Jacintoport v. Greater Baton Rouge Port Commission*, 762 F.2d 435, 442 (5th Cir. 1985) (indicating reasons for immunity are stronger where claim implicates "public policy" or "public affairs"), *cert. denied*, 474 U.S. 1057, 106 S.Ct. 797, 88 L.Ed.2d 774 (1986).

### III

### *The Standard Applied*

Several critical factors suggest that the Ports Authority, in running and maintaining the docks, is *not* entitled to Eleventh Amendment immunity. First, Puerto Rico law gives the Authority the specific tasks of "own[ing], operat[ing], and manag[ing] ... transportation facilities," P.R.Laws Ann. tit. 23, § 336, including the "public property docks," *id.* § 2202, where Royal Caribbean's ship docked and the crewmen were injured. It authorizes the Authority to charge users of those docks fees "sufficient, at least, to ... cover the expenses incurred ... for the preservation, development, improvement, extension, repair, conservation and operation" of those docks, to "pay principal and interest on ... the Authority's bonds," *id.* § 336(*l*)(1), and to "acquire, ... produce, sell, ... and otherwise dispose of ... services, goods, and ... property ... in connection with its activities," *id.* § 336(i); *see also id.* §§ 336(q), (s), (u), 2505. The Ports Authority does charge fees, which, its Executive Director says, "cover" its operating expenses. (Indeed, its annual financial statements show that its "net income" from fiscal years 1987 through 1989 averaged more than $5 million.) Taken together, these factors suggest dock-operating activities that are not "governmental" but "proprietary," rather like those of a private company that manages an office building and charges tenants for its services. *Cf., e.g., Ainsworth*, 818 F.2d at 1038 (Puerto Rico Tour-

ism Company's "activities as a purchaser and supplier of slot machines are not alien to a proprietary function"); *Paul N. Howard Co. v. Puerto Rico Aqueduct Sewer Authority*, 744 F.2d 880, 886 (1st Cir.1984) (government corporation "established to provide drinking water and sewage facilities ... not normally immune"), *cert. denied*, 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); *City of Long Beach v. American President Lines, Ltd.*, 223 F.2d 853, 856 (9th Cir.1955) (proprietary activity where government maintained harbor and charged fees to users).

Second, the record indicates that the Ports Authority, not the Commonwealth treasury, would likely pay any eventual judgment in plaintiffs' favor (even if the judgment is for the full $531,812, plus interest, costs, fees and future payments to the injured crewmen, that plaintiffs seek). The Ports Authority says that its fees and other charges are "barely sufficient" to cover its expenses. But, those "expenses," the Ports Authority's Executive Director says in his affidavit, "include payment of judgments entered against it." And the Authority's public financial statements tell the same story, showing that the Authority deducted, from its annual revenues (before "net income") $1.2 million for "litigation claims and settlements" in 1988, and $76,-000 in 1989.

Moreover, the Ports Authority does not depend on Commonwealth financing for its income. Although the Authority points to nearly $2,000,000 in construction grants it received from the Commonwealth in the late 1960's, the record and the public financial statements show that the Authority, normally and in recent years, has not received substantial Commonwealth financing. To the contrary, it must pay the Commonwealth $400,000 per year in lieu of taxes. P.R.Laws Ann. tit. 23, § 354. The same statute permits the Authority to reduce its annual payment of $400,000 if its "net income is not sufficient" in any fiscal year (a circumstance which, as far as the record and statutes reveal, would include shortfalls due to payments of court judgments). *Id.; see also Canadian Transp.*

*Co. v. Puerto Rico Ports Authority,* 333 F.Supp. 1295, 1297–98 (D.P.R.1971).

Further, the Ports Authority has insurance, which would insulate the Commonwealth treasury from the effects of an adverse judgment.

Finally, Puerto Rico statutes provide that the Authority's debts are not "those of the Commonwealth." P.R.Laws Ann. tit. 23, § 333(b).

These facts weigh heavily against immunity. *Compare Feeney v. Port Authority Trans–Hudson Corp.,* 873 F.2d 628, 631 (2d Cir.1989), *aff'd,* 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990) (where "liability will place the state treasury at risk," that is "the single most important factor" favoring immunity); *In re San Juan Dupont Plaza Hotel Fire Litigation,* 888 F.2d 940, 943–44 (1st Cir.1989) (Puerto Rico Tourism Company immune where Commonwealth supplied 70–75% of Company's funds) [hereinafter *San Juan Dupont*] *Culebras Enterprises Corp. v. Rivera Rios,* 813 F.2d 506, 517 (1st Cir.1987) (similar); *Morris v. Washington Metropolitan Area Transit Authority,* 781 F.2d 218, 225 (D.C.Cir.1986) (immunity where "the practical result of a judgment ... would be payment from [state] treasuries"), *with Paul N. Howard Co.,* 744 F.2d at 886 (that Sewer Authority did "not seriously dispute" plaintiff's claim that judgment could be paid out of Authority's funds supports finding of no immunity); *Jacintoport,* 762 F.2d at 441 (similar, concerning government port authority); *Fitchik v. New Jersey Transit Rail Operations, Inc.,* 873 F.2d 655, 660–61 (3d Cir.) (Transit Authority's dependence on state for only 30% of funds, and authorization to "purchase liability insurance" strongly supported no immunity), *cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989); *see also Durning,* 950 F.2d at 1424 n. 2 ("legal liability" of state treasury, not agency's "practical ability" to pay is "applicable standard"); *but cf. San Juan Dupont,* 888 F.2d at 943 (statutory provision that Commonwealth not liable for Tourism Company's debts insufficient to outweigh other factors favoring immunity).

Third, the Ports Authority operates with a considerable degree of autonomy. Its statute, which calls it a "public corporation," gives it a "legal existence and personality separate and apart from those of the Government." P.R.Laws Ann. tit. 23, § 333(b). It has "complete control and supervision of any undertaking constructed or acquired by it, including the power to determine the character of and necessity for all its expenditures." *Id.* § 336(d). It can sue and be sued and makes its own contracts. *Id.* § 336(e), (f). It may acquire, use and dispose of property as it deems "necessary" or "convenient" in carrying out its lawful activities. *Id.* § 336(i), (j). It may "borrow money" and "issue bonds" as its activities require. *Id.* § 336(n), (o). It has considerable discretion in setting fees. *Id.* § 336(*l*)(1). Its funds are kept in accounts separate from the Commonwealth's treasury. *Id.* § 338. The Ports Authority, not the Commonwealth, is liable for payment of principal and interest on its bonds. *Id.* § 336(u). And, as we have said, its "debts" and "obligations ... shall be deemed to be those of" the Ports Authority, and not to be those of the Commonwealth. *Id.* § 333(b).

We recognize that other factors argue in favor of Eleventh Amendment immunity. The Authority's operating autonomy is tempered by the fact that several government officials and one citizen appointed by the Governor comprise its board of directors, that this board selects an Executive Director, *id.* § 334, who communicates regularly with the executive branch, and that this arrangement (according to the Executive Director's affidavit) permits the Governor's office to "exercise significant control over the planning and administration of its policies" (but not to "exercise control over the day-to-day internal operations" of the Authority). *See also Port Authority Police Benevolent Ass'n v. Port Authority of New York and New Jersey,* 819 F.2d 413, 417 (3d Cir.) (Governors' roles in appointment of commissioners and veto over their actions indicates Authority not "independent"), *cert. denied,* 484 U.S. 953, 108 S.Ct. 344, 98 L.Ed.2d 370 (1987).

In addition, the Authority must submit various reports to the Governor and the Legislature; it must follow other Treasury-prescribed accounting rules; it must keep its funds in Commonwealth-approved depositories. P.R.Laws Ann. tit. 23, §§ 345, 338. Further, the Authority can (like a sovereign) exercise the power of eminent domain. *Id.* § 336(h); *see also id.* §§ 339, 339a. And, it is immune from Commonwealth taxes (although it must, as we have noted, pay an annual $400,000 fee in lieu of taxes). *Id.* §§ 348, 354.

Finally, as the district court found, relevant statutes and their legislative histories stress the "public" objectives of the Authority, including its mandates to promote "the general welfare," to "increase ... commerce and prosperity," *id.* § 348(a), and "to facilitat[e] and motivat[e] the development of the economic sectors that drive the present Puerto Rican economy," Legislature of Puerto Rico, 1989 Act No. 65, at 300 (Aug. 17, 1989) (Statement of Motives for S. Bill 269, H. Bill 446). These express statutory and legislative purposes make the Authority's activities seem more "governmental" and less "proprietary." Nonetheless, these provisions are consistent with "proprietary" activities and findings of no immunity. *See Durning*, 950 F.2d at 1421 (Development Authority is not immune despite a statutory purpose to redress "critical shortage of adequate housing" and "to promote economic welfare"); *Ainsworth*, 818 F.2d at 1038 (Puerto Rico Tourism Company not necessarily immune despite a statute declaring it an "instrumentality of the Government" with the purpose of "promot[ing] tourism and overs[ee-ing] gambling"); *Riefkohl v. Alvarado*, 749 F.Supp. 374, 375 (D.P.R.1990) (Puerto Rico Electric Power Authority not immune, despite statute declaring it a "governmental instrumentality" with the purpose of "promot[ing] the general welfare and increas[ing] commerce and prosperity"). After all, a private entity might operate a hotel or restaurant, in part with the object of helping to promote economic prosperity and development.

Overall, the factors militating against immunity predominate. They indicate that the Ports Authority is an entity that enjoys a considerable degree of autonomy, that it provides a service (maintaining and operating docking facilities) that it, in effect, "sells" to users, and that it here faces a lawsuit in which the plaintiffs seek a judgment likely to be paid from the Authority's funds, not from the Commonwealth's Treasury. Numerous cases find no immunity on facts very similar to those present here. *See, e.g., Feeney*, 873 F.2d 628; *Jacinto-port*, 762 F.2d 435; *City of Long Beach*, 223 F.2d 853; *see also Paul N. Howard Co.*, 744 F.2d 880; *Durning*, 950 F.2d 1419.

We recognize that, in *M/V Manhattan Prince*, we found that this same Ports Authority enjoyed immunity from a tort suit claiming negligence by a Ports Authority-licensed harbor pilot. In that case, however, the Ports Authority's relevant "type of activity," 897 F.2d at 10, was fundamentally different. The Authority did not "sell" pilot services. It did not "train pilots" or "derive[ ] ... revenue from the ... pilot system." *Id.* at 12. Rather, the shipowners, required to use the pilot service, paid "a fee directly to the pilot and also into a trust fund, created by [the Ports Authority], for the pilots' pension." *Id.* at 10 (quoting district court opinion, 669 F.Supp. 34, 37 (D.P.R.1987)). The Authority lacked the "power to control the actions of the pilot while he" performed his duties. *Id.* The Authority's role was not that of *selling* pilot services, but, rather, was that of *regulating* the licensing of pilots (and regulating pilot fees and retirement benefits). Such regulation is traditionally a governmental, not a proprietary, function. *Id.* at 10–11. The difference between the primarily "governmental function" at issue in *M/V Manhattan Prince*, and the basically "proprietary function" here at issue explains the difference in result.

For these reasons, the summary judgment in the Port Authority's favor is

*Reversed.*